820 So.2d 297 (2002)
LEE COUNTY ELECTRIC COOPERATIVE, INC., Appellant,
v.
E. Leon JACOBS, Jr., et al., Appellees.
No. SC01-373.
Supreme Court of Florida.
May 2, 2002.
Rehearing Denied June 19, 2002.
*298 Steven L. Brannock of Holland & Knight LLP, Tampa, FL; D. Bruce May and Karen D. Walker of Holland & Knight LLP, Tallahassee, FL; and John A. Noland of Henderson, Franklin, Starnes & Holt, Fort Myers, FL, for Appellant.
Richard D. Melson and Dan R. Stengle of Hopping, Green, Sams & Smith, P.A., Tallahassee, FL; and Harold McLean, General Counsel, and Mary Anne Helton, Associate General Counsel, Florida Public Service Commission, Tallahassee, FL, for Appellees.
PER CURIAM.
This case is before the Court on appeal from an order of the Florida Public Service Commission (PSC). We have jurisdiction. See art. V, § 3(b)(2), Fla. Const. The issue presented concerns whether the PSC has rate structure jurisdiction over a rural electric cooperative's wholesale rate schedule established pursuant to contract. For the reasons expressed below, we affirm the PSC's order concluding that it does not have such jurisdiction.
Lee County Electric Cooperative (LCEC) is a non-profit electric distribution cooperative organized under chapter 425, Florida Statutes, and engaged in the distribution and sale of electric energy within its approved service territory in southwest Florida. LCEC serves approximately 139,000 customers, most of which are in Lee County. Seminole Electric Cooperative is a non-profit electric generation and transmission cooperative also organized pursuant to chapter 425. Seminole provides electricity at wholesale to its ten owner-members, one of which is LCEC. Each of Seminole's members, like LCEC, is a distribution electric cooperative engaged in the retail sale of electricity to Florida customers. Seminole is governed by a thirty-member board of trustees that consists of two voting members and one alternate from each of its ten member distribution cooperatives.
LCEC purchases all of its power requirements from Seminole pursuant to a wholesale power contract between LCEC and Seminole, originally dated May 22, 1975, and supplemented and amended from time to time. LCEC must purchase all of its power requirements from Seminole during the 45-year term of the contract, which does not expire until 2020. The contract specifies the procedure for determining the rate the members pay Seminole for wholesale service. The rate schedule applies uniformly to all members. The contract provides that the board of trustees will review Seminole's rate schedule at least once a year. In the contract, LCEC agreed to be bound by the rate schedule established by the board. The contract specifically provides that the only regulatory review required is approval from the administrator of the federal Rural Utilities Service (formerly the Rural Electrification Administration).[1]
*299 On October 8, 1998, the Seminole board approved a new rate schedule applicable to all of its members, Rate Schedule SECI-7, effective January 1, 1999. The Rural Utilities Services approved the new schedule on November 20, 1998. LCEC alleges that this new schedule creates a new rate structure that replaces the existing demand charge with two separate charges: a reduced demand charge based on monthly billing demand and a new "Production Fixed Energy Charge" which is allocated to members based on their three-year historical energy usage.
On December 8, 1998, LCEC filed its complaint with the PSC, asking the PSC to conduct a full investigation and evidentiary hearing on Seminole's new rate schedule. LCEC based its complaint on section 366.04(2)(b), Florida Statutes (1997), which gives the PSC power to "prescribe a rate structure for all electric utilities."
Seminole moved to dismiss LCEC's complaint, claiming that the PSC is without jurisdiction to review Seminole's wholesale rate schedule. In response, LCEC claimed that the PSC's exercise of jurisdiction falls squarely within the language and intent of section 366.04 and is consistent with the PSC's duty to encourage conservation and ensure the reliability of the electric grid.
The PSC met and considered the motion to dismiss twice. The first time the motion was denied by virtue of a two-two tie vote. Upon the request of the parties, the PSC later reconsidered the jurisdictional issue and this time a panel of commissioners voted two-to-one to dismiss LCEC's complaint. The majority held that the statutes do not "expressly indicate that this Commission has jurisdiction to prescribe a wholesale rate structure for a rural electric cooperative." This appeal follows.
The issue in this case is whether section 366.04(2) grants the PSC rate structure jurisdiction over a rural cooperative's wholesale rate schedule established pursuant to contract. Both parties agree that the standard of review is de novo. Based on our interpretation of section 366.04(2), we conclude that the PSC did not err granting the motion to dismiss for lack of jurisdiction.
In 1974, the Legislature passed the Grid Bill, codified at sections 366.04(2) and 366.05(7)-(8), Florida Statutes (2001). Prior to that time, the PSC had no jurisdiction over cooperatives. The Grid Bill gives the PSC limited jurisdiction over municipal electric utilities and electric cooperatives:
(2) In the exercise of its jurisdiction, the commission shall have power over electric utilities for the following purposes:
. . . .
(b) To prescribe a rate structure for all electric utilities.
§ 366.04(2), Fla. Stat. (2001).[2] Section 366.02, Florida Statutes (2001), provides the following definition for an electric utility:
(2) "Electric utility" means any municipal electric utility, investor-owned electric utility, or rural electric cooperative which owns, maintains, or operates an *300 electric generation, transmission, or distribution system within the state.
In its order, the PSC acknowledges that Seminole is an electric utility. However, the PSC notes that the term "rate structure" is not defined in chapter 366. At a hearing below, Commissioner Deason offered the following definition of "rate structure":
When I read this language, and I think I've indicated this earlier, to me, rate structureand I don't think rate structure is defined anywhere in the statute. But to me, rate structure means the structure of rates as they relate to different rate classes, and a classic example is residential, commercial, industrial, classifications of those types. And that rate structure connotes to me an offering by a utility that says these are the terms and conditions that we will provide service to you, and if you meet those terms and conditions, you will be provided the service on a nondiscriminatory basis, and it doesn't really apply to a situation where you have entities who have voluntarily entered into a negotiated contract. And if there are provisions within that contract which allow for the rates to change over time, I still don't think that meets the definition of a rate structure as I think it's contemplated.
For this reason, the PSC concluded that it did not have jurisdiction to prescribe a wholesale rate structure for a rural electric cooperative. To support this conclusion, the PSC contends that any reasonable doubt regarding its regulatory power compels the PSC to resolve that doubt against the exercise of jurisdiction. See City of Cape Coral v. GAC Utilities, 281 So.2d 493, 496 (Fla.1973). We agree.
Further, as the PSC emphasized in its order, Seminole's rate schedule was established by Seminole's board of trustees, pursuant to the terms of Seminole's contract with LCEC. LCEC voluntarily entered into this contract. We find, therefore, that any contention that LCEC has with Seminole's current rate schedule is more appropriately raised in an action filed in the circuit court.
Finally, we address LCEC's "regulatory gap" argument. All of the parties agree that under the current state of the law, the wholesale rate structures of rural electric cooperatives in Florida are essentially unregulated.[3] As stated in LCEC's brief, there is no federal bar to a particular state's public service commission exercising jurisdiction over the wholesale rate structures of rural electric cooperatives. See Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983) (holding that the Rural Electrification Act does not preempt state rate regulation of rural electric cooperatives). Regardless of this view of federal law, it does not answer the question of whether the Legislature of this state intended for the rate schedules of cooperatives such as Seminole to be regulated by the PSC or whether these cooperatives were intended to be self-governing. Based on our review of the record, we find that they were intended to be self-governing.
Accordingly, we affirm the PSC's order determining that it does not have rate *301 structure jurisdiction over a rural cooperative's wholesale rate schedule established pursuant to contract.
It is so ordered.
HARDING, PARIENTE, and LEWIS, JJ., concur.
WELLS, C.J., concurs with an opinion.
ANSTEAD, J., dissents with an opinion, in which SHAW and QUINCE, JJ., concur.
WELLS, C.J., concurring.
I join the majority decision and would additionally note that the Public Service Commission (PSC) has not asserted jurisdiction over these cooperatives since this statute was adopted more than twenty-five years ago. Surely if the Legislature had intended that the PSC assert such jurisdiction, the Legislature would have amended the statute to expressly so state after several legislative sessions of the PSC not so doing. In fact, the Legislature has amended the statute during this period but did not amend it in that manner. Therefore, I think, we should not, after such a long period, hold that the PSC's interpretation of the statute was in error. If it is in error under these circumstances, the Legislature should amend the statute to expressly so state.
ANSTEAD, J., dissenting.
I must express my disagreement with the majority's decision limiting the regulatory jurisdiction of the Florida Public Service Commission.[4] I would approve and adopt the thorough and scholarly dissenting opinion filed by Commissioner Jacobs in the proceedings before the Commission.[5]
After thoroughly analyzing all aspects of the issue, Commissioner Jacobs concluded:
The provisions of Chapter 366, Florida Statutes, given their plain and ordinary meaning, clearly convey jurisdiction upon this Commission to prescribe a wholesale rate structure for rural electric cooperatives, such as Seminole. Seminole has not demonstrated that the plain language of the statute inaccurately reflects the Legislature's intent or that application of the plain language leads to a ridiculous or unreasonable result. Further, by not exercising this jurisdiction in the past, this Commission has in no way forfeited its authority to do so now. Therefore, I believe that this Commission has jurisdiction over the subject matter of LCEC's complaint and petition. Further, I believe that the exercise of this jurisdiction is reasonable and appropriate in this case, especially in view of the clear absence of preemption at the Federal level.
Commissioner Jacobs' analysis and conclusion are essentially predicated upon the undeniable fact that the Legislature has clearly chosen to regulate electric utilities in Florida by vesting comprehensive regulatory authority in the Public Service Commission.
It is because I find the Legislature's unambiguous decision to regulate to be controlling that I am compelled to respectfully disagree with the majority's decision denying the commission comprehensive regulatory authority over a significant segment of electric utilities operating in Florida. No one denies that the plain meaning *302 of the language used in the statutory scheme appears to grant regulatory authority to the commission. To be sure, once the Legislature has decided that the public should be served by a comprehensive regulatory scheme, one would logically expect that the regulator would be vested with full authority to carry out its responsibilities. Nor can it be denied that limiting that authority should make the overall task of regulation more difficult, since the commission will never have control of the entire "big picture" of electric utility activity in the state. That is, comprehensive regulation will, in effect, always be undermined by the regulatory body's inability to deal with a significant amount of electric utility activity that has now been immunized from commission oversight. Accordingly, it would seem logical to conclude that once the Legislature has decided that broad regulatory authority should be vested in the commission, any exceptions to regulation would be clearly set out in the statutory scheme. Of course, no exceptions have been cited here.
Under the majority's holding, we end up with only partial regulation of electric utilities in Florida. Now, if it could be demonstrated that partial regulation is what the Legislature intended, then so be it, since that would be the Legislature's call. However, in my view we have taken a statutory scheme mandating comprehensive regulation over electric utilities and effectively turned it on its head by excepting significant electric utilities activities from regulation. Hence, we end up with a partial scheme of regulation and a limited regulatory authority that may be seriously undermined by unregulated utilities activity that may affect the commission's overall responsibility to regulate, but is now outside the commission's reach. Surely, the consistency and stability of utility regulation in Florida will not be served by such a piecemeal scheme.
SHAW and QUINCE, JJ., concur.

APPENDIX A

DISSENT
COMMISSIONER JACOBS dissents, as set forth below:
I disagree with the majority's findings regarding our jurisdiction under Section 366.04(2)(b), Florida Statutes. Upon review of the arguments presented and authority cited by LCEC and Seminole, I believe that the provisions of Chapter 366, Florida Statutes, grant the Commission jurisdiction to prescribe a wholesale rate structure for Seminole.

A. Plain Language of the Statute

In its complaint and petition, LCEC requests that we review Seminole's new rate schedule pursuant to the jurisdiction granted by Section 366.04(2)(b), Florida Statutes, which provides:
(2) In the exercise of its jurisdiction, the commission shall have the power over electric utilities for the following purposes:
* * *
(b) To prescribe a rate structure for all electric utilities.

(Emphasis added). This provision does not make a distinction between retail and wholesale rate structures or between utilities engaged in retail sales and utilities engaged in wholesale sales. It states that our rate structure jurisdiction extends to all electric utilities.
Section 366.02(2), Florida Statutes defines the term "electric utility" as follows:
(3) "Electric utility" means any municipal electric utility, investor-owned electric utility, or rural electric cooperative *303 which owns, maintains, or operates an electric generation, transmission, or distribution system within the state."
(Emphasis added). Seminole is a rural electric cooperative which owns, maintains, and operates generation and transmission facilities within the state. Seminole concedes it is an "electric utility" as defined in Section 366.02(2), Florida Statutes.
Sections 366.04(2)(b) and 366.02(2), Florida Statutes, given their plain and ordinary meaning, clearly and unambiguously convey upon this Commission the jurisdiction to prescribe a rate structure for a rural electric cooperative, such as Seminole, that owns, maintains, and operates a generation and transmission system within the state.
When a statute is clear and unambiguous, courts will not look behind the statute's plain language for legislative intent or resort to rules of statutory construction to ascertain intent. City of Miami Beach v. Galbut, 626 So.2d 192, 193 (Fla.1993); Holly v. Auld, 450 So.2d 217, 219 (Fla. 1984). Instead, the statute's plain and ordinary meaning must be given effect unless it leads to an unreasonable or ridiculous result. Miami Beach, at 193. A departure from the plain language of a statute is permitted only when there are cogent reasons for believing that the language of the statute does not accurately reflect legislative intent. Holly, at 219. I find that application of the plain language of the statute does not lead to an unreasonable or ridiculous result. Further, I find there has been no demonstration that the language of the statute inaccurately reflects the legislative intent.

B. Legislative Intent

Seminole argues two points related to the legislative intent behind the statutory provisions at issue: (1) Commission jurisdiction over wholesale rate structures of rural electric cooperatives is inconsistent with the purpose of Chapter 366, Florida Statutes; and (2) Commission jurisdiction over wholesale rate structures of rural electric cooperatives is inconsistent with other provisions of Chapter 366, Florida Statutes.

1. Consistency with Purpose of Chapter 366
First, Seminole argues that Commission jurisdiction over Seminole's rate structure is inconsistent with the purpose of Chapter 366, Florida Statutes. Citing City of St. Petersburg v. Carter, 39 So.2d 804 (Fla. 1949), Seminole asserts that the underlying purpose of Chapter 366 is to prevent potential abuses of monopoly power when the public obtains electric service from a monopoly provider. Seminole points out that LCEC is not a captive customer of a monopoly provider, but instead, its obligation to purchase power from Seminole was the result of voluntary contractual negotiations.
In Carter, the court stated that "[t]he Florida Railroad and Public Utilities Commission was created for the purpose of protecting the general public from unreasonable and arbitrary charges that might be made by railroads and other transportation companies which may be classified as monopolies." Id[.], at 806. While this may be an accurate general statement of this Commission's original purpose, it clearly does not provide an exhaustive list of this Commission's purposes in 2000, much less the present purposes of Chapter 366, Florida Statutes. The Legislature's intent in making its original grant of jurisdiction to this Commission is not determinative of the Legislature's intent in making subsequent grants of authority, such as that made in Section 366.04(2)(b), Florida Statutes. It is more appropriate to look to the purpose of the statute in question to *304 determine whether a particular construction of that statute is consistent with its purpose. Seminole, however, has not offered any argument concerning the specific purpose of Section 366.04(2)(b), Florida Statutes.
Section 366.04(2)(b), Florida Statutes, was enacted in 1974 as part of Chapter 74-196, Laws of Florida (the "Grid Bill"). The Grid Bill gave this Commission jurisdiction over all electric utilities, including, for the first time, rural electric cooperatives and municipal electric utilities, for the purpose of assuring an adequate and reliable source of energy for the state. Specifically, we were granted jurisdiction to oversee the planning, development, and maintenance of a coordinated electric power grid; to require electric power conservation and reliability within a coordinated grid; to prescribe a rate structure for all electric utilities; and to resolve territorial matters.
An argument could be made that our rate structure jurisdiction was intended to provide us some limited measure of control over the rates charged by municipal electric utilities and rural electric cooperatives to protect captive retail customers from unreasonable charges. However, given the clear purpose of the Grid Billto assure an adequate and reliable source of energy for the stateit appears equally, if not more, likely that our rate structure jurisdiction was intended to ensure that rates were structured in a manner consistent with the goals of reliability and conservation. The allegations of LCEC's complaint and petition indicate that LCEC is concerned with Seminole's new rate structure at least in part because of its potential to harm LCEC's conservation efforts and to encourage development of uneconomic generation. This type of harm appears to clearly fall within the jurisdiction granted to this Commission through the broad language of the Grid Bill. The lack of a distinction between retail and wholesale rate structures is further evidence of the broad jurisdiction granted by the Grid Bill.

2. Consistency with Other Provisions of Chapter 366
Second, Seminole argues that Commission jurisdiction over Seminole's rate structure is inconsistent with Section 366.11, Florida Statutes, and other provisions of Chapter 366, Florida Statutes. Seminole notes that Section 366.11(1), Florida Statutes, specifically exempts from Commission jurisdiction wholesale power sales by investor-owned utilities to municipal and cooperative electric utilities. Seminole asserts that this exemption is required because those provisions of Chapter 366 which give this Commission ratemaking authority over investor-owned utilities do not explicitly distinguish retail sales from wholesale sales. Seminole also notes that Section 366.11(1), Florida Statutes, does not specifically exempt wholesale sales by municipal and cooperative electric utilities from Commission jurisdiction. Seminole asserts that the lack of an exemption can be interpreted two ways: (1) all such transactions are subject to this Commission's rate structure jurisdiction; or (2) the Legislature never intended or expected Section 366.04(2)(b), Florida Statutes, to confer jurisdiction over wholesale transactions, so no exemption was required. Seminole concludes that the latter is the only reasonable interpretation when Chapter 366, Florida Statutes, is considered as a whole, because any other interpretation would result in this Commission exercising more jurisdiction over wholesale sales by municipal and cooperative electric utilities than over wholesale sales by investor-owned utilities. Seminole contends that this would be an illogical result.
*305 I am not persuaded by Seminole's argument. First, Seminole's premise that Section 366.11(1), Florida Statutes, exempts from our jurisdiction wholesale power sales by investor-owned utilities to municipal and cooperative electric utilities is incorrect. Section 366.11(1), Florida Statutes, provides in pertinent part:
No other provision of this chapter shall apply in any manner, other than as specified in ss. 366.04, 366.05(7) and (8), 366.051, 366.055, 366.093, 366.095, 366.14, and 366.80 366.85, ... to the sale of electricity, manufactured gas, or natural gas at wholesale by any public utility to, and the purchase by, any municipality or cooperative under or pursuant to any contracts ... when such municipality or cooperative is engaged in the sale and distribution of electricity or manufactured or natural gas, or to the rates provided for in such contracts.
(Emphasis supplied.) Clearly, the limited exemption in Section 366.11(1), Florida Statutes, is not intended to diminish our jurisdiction over electric utilities pursuant to the Grid Bill, which includes the jurisdiction granted in Sections 366.04 and 366.05(7) and (8), Florida Statutes, although that jurisdiction may be preempted by FERC.
Second, as LCEC noted, it is a commonly accepted principle of statutory construction that the express exemption of one thing in a statute, and silence regarding another, implies an intent not to exempt the latter. PW Ventures, Inc. v. Nichols, 533 So.2d 281, 283 (Fla.1988). Applying the principle to this case, the most reasonable interpretation of Section 366.11(1), Florida Statutes, read together with the statutes listed therein, including Section 366.04, Florida Statutes, is that the Legislature knew how to exempt wholesale matters from certain aspects of this Commission's jurisdiction but chose not to exempt wholesale sales in their entirety. This interpretation is consistent with the plain language used by the Legislature in Sections 366.02(2) and 366.04(2)(b), Florida Statutes, as discussed above. Further, the lack of an exemption for wholesale sales by municipal and cooperative electric utilities is consistent with FERC's lack of jurisdiction over such sales, as discussed below. There is nothing unreasonable or ridiculous about this interpretation.
In summary, Seminole has not demonstrated that the plain language of the statute inaccurately reflects the Legislature's intent or that application of the plain language leads to an unreasonable or ridiculous result. Instead, it appears that our jurisdiction over wholesale rate structures of rural electric cooperatives and municipal electric utilities is consistent with the purposes of the Grid Bill and with the provisions of Chapter 366, Florida Statutes.

C. Commission's Past Inaction

As noted in the majority opinion, this Commission has not exercised jurisdiction over the wholesale rate structure of a rural electric cooperative or municipal electric utility at any time since the enactment of Section 366.04(2)(b), Florida Statutes. However, we have not affirmatively stated at any time that Section 366.04(2)(b), Florida Statutes, does not give us jurisdiction over the wholesale rate structures of rural electric cooperatives, nor has any court.
Seminole contends that by our past inaction we have tacitly acknowledged that we lack such jurisdiction and cannot now abandon our "practical interpretation" of Section 366.04(2)(b), Florida Statutes. LCEC argues that our past inaction does not amount to a determination that we lack jurisdiction. Even assuming that our past inaction does amount to a tacit determination *306 on jurisdiction, LCEC argues that we are not bound by that determination.
I am persuaded by LCEC's analysis. As LCEC points out, agency inaction cannot deprive an agency of jurisdiction conferred. See, e.g., State ex rel[.] Triay v. Burr, [79 Fla. 290] 84 So. 61, 74 (Fla.1920); United States v. Morton Salt Co., 338 U.S. 632, 647 [70 S.Ct. 357, 94 L.Ed. 401] (1950); United States v. American Union Transport, 327 U.S. 437, 454, n. 18 [66 S.Ct. 644, 90 L.Ed. 772] (1946). In State ex rel[.] Triay v. Burr, the Florida Supreme Court spoke on this subject:
When a valid statute confers a power or imposes a duty upon designated officials, a failure to exercise the power or perform the duty does not affect the existence of the power or duty or curtail the right to require performance in a proper case.
Id[.], at 74. Further, while an agency's failure to exercise a power may be significant as a factor in evaluating whether that power was actually conferred, it alone does not extinguish that power or compel an inference that the agency has concluded it lacks jurisdiction. United States v. American Union Transport, at 454, n. 18 [66 S.Ct. 644]. In this case, the jurisdiction granted by the plain language of Chapter 366, Florida Statutes, cannot be extinguished or outweighed by this Commission's past inaction.
Even assuming that our past inaction does amount to an implicit determination on jurisdiction, this Commission is not precluded by its past inaction from exercising jurisdiction over Seminole's rate structure. In United States v. American Union Transport, the court stated:
An administrative agency is not ordinarily under an obligation immediately to test the limits of its jurisdiction. It may await an appropriate opportunity or clear need for doing so. It may also be mistaken as to the scope of its authority.
Id[.], at 454, n. 18 [66 S.Ct. 644]. LCEC asserts that we may have misapprehended the scope of our authority when we failed to require Seminole to file its tariffs along with the distribution cooperatives in 1978. LCEC's argument is reasonable. In 1967, the Federal Power Commission, FERC's predecessor, disavowed jurisdiction over the wholesale sales of cooperatives, Dairy-land Power Cooperative, et al., 37 F.P.C. 12 (1967), but it was not until 1983 that the U.S. Supreme Court held in Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission, 461 U.S. 375 [103 S.Ct. 1905, 76 L.Ed.2d 1] (1983), that state regulation of wholesale electric cooperatives was not preempted by federal law and may not constitute an unconstitutional burden on interstate commerce. In addition, there is no indication that this Commission has had a clear need yet to exercise jurisdiction in this area.
I am not persuaded by Seminole's contention that we cannot now abandon our "practical interpretation" of Section 366.04(2)(b), Florida Statutes. First, this contention is clearly inconsistent with the principle, stated above, that an agency's failure to exercise power conferred upon it does not affect the existence of that power. Second, none of the cases cited by Seminole hold that an agency cannot, under any circumstance, change its interpretation, explicit or implicit, of its governing statute. The cases cited by Seminole stand for the proposition that an agency's construction of its governing statute is persuasive and should be given great weight, but is not controlling. See, Carter, at 806; Walker v. State Department of Transportation, 366 So.2d 96 (Fla. 1st DCA 1979); Green v. Stuckey's of Fanning Springs, 99 So.2d 867 (Fla.1957).

*307 D. Reasonable Doubt as to Commission Jurisdiction

Seminole points out that this Commission is a creature of statute and may exercise only those powers conferred expressly or impliedly by statute. Citing City of Cape Coral v. GAC Utilities, Inc., of Florida, 281 So.2d 493 (Fla.1973) and Radio Telephone Communications, Inc. v. Southeastern Telephone Company, 170 So.2d 577, 582 (Fla.1964), Seminole asserts that any reasonable doubt about the existence of this Commission's jurisdiction must be resolved against the exercise of such jurisdiction. Seminole contends that there is certainly reasonable doubt about the Legislature's intent to grant this Commission authority over the wholesale rate structures of municipal and cooperative electric utilities.
Based on the analysis set forth above, I find no reasonable doubt about the existence of the jurisdiction conferred upon this Commission in Section 366.04(2)(b), Florida Statutes. Rather, the provisions of Chapter 366, Florida Statutes, given their plain and ordinary meaning, clearly and unambiguously convey jurisdiction upon us to prescribe a rate structure for all electric utilities, including rural electric cooperatives engaged in the generation and transmission of electricity in the state of Florida.

E. Conclusion

The provisions of Chapter 366, Florida Statutes, given their plain and ordinary meaning, clearly convey jurisdiction upon this Commission to prescribe a wholesale rate structure for rural electric cooperatives, such as Seminole. Seminole has not demonstrated that the plain language of the statute inaccurately reflects the Legislature's intent or that application of the plain language leads to a ridiculous or unreasonable result. Further, by not exercising this jurisdiction in the past, this Commission has in no way forfeited its authority to do so now. Therefore, I believe that this Commission has jurisdiction over the subject matter of LCEC's complaint and petition. Further, I believe that the exercise of this jurisdiction is reasonable and appropriate in this case, especially in view of the clear absence of preemption at the Federal level.

F. Contract Not a Bar to Commission Jurisdiction

Finally, Seminole suggests that this Commission is precluded from asserting jurisdiction in this case by the Florida Supreme Court's decision in United Telephone Company v. Public Service Commission, 496 So.2d 116 (Fla.1986). Seminole states that the Court held that the provisions of Chapter 364, Florida Statutes, which gave us jurisdiction to alter unreasonable rates or practices by a telephone company, referred to rates and practices as applied to ratepayers but did not confer jurisdiction to alter the contractual relationship between telephone companies. Based on the Court's opinion, Seminole argues that we are precluded from asserting jurisdiction over contracts between utilities, including the wholesale power contract between Seminole and LCEC.
Seminole's interpretation of the Court's opinion is inaccurate. In United Telephone, the Court examined Chapter 364, Florida Statutes, to determine if any of its provisions gave us jurisdiction to alter the contracts in question. Finding none, the Court held that this Commission lacked jurisdiction to alter the contracts. The Court did not, however, hold that we are precluded from asserting jurisdiction over contracts between utilities per se. Rather, the Court simply held that no provision of *308 Chapter 364, Florida Statutes, gave us jurisdiction over the subject matter of the contracts that it attempted to alter.
As stated above, I find that the provisions of Chapter 366, Florida Statutes, convey jurisdiction upon the Commission to prescribe a wholesale rate structure for rural electric cooperatives. Thus, the United Telephone opinion is not on point. Further, as LCEC points out, private parties cannot by agreement deprive an agency of the jurisdiction conferred upon it. See, South Lake Worth Inlet. Dist. v. Town of Ocean Ridge, 633 So.2d 79, 89 (Fla. 4th DCA 1994).
For these reasons, I dissent from the majority's decision.
NOTES
[1] Seminole points out that there have been a number of rate schedule amendments over the lifetime of the Seminole contract, yet LCEC has never previously attempted to submit these amendments to the PSC for review.
[2] Prior to its amendment in 1989, this subsection provided:

(2) In the exercise of its jurisdiction, the commission shall have power over rural electric cooperatives and municipal electric utilities for the following purposes:
. . . .
(b) To prescribe a rate structure for all electric utilities.
§ 366.04(2), Fla. Stat. (1987). In 1989, the words "rural electric cooperatives and municipal" were taken out. See ch. 89-292, § 2, at 1798, Laws of Fla.
[3] The Seminole contract provides that amendments to rate schedules are subject to review by the administrator of the federal Rural Utilities Service (RUS). LCEC, however, discounts the importance of RUS review. LCEC claims that the RUS's role is more of a lender than a regulator and that it only reviews Seminole's rate structure for the purpose of determining whether it will generate sufficient revenue to retire the debt. LCEC asserts that the RUS has no interest in whether Seminole's rate structure is fair and reasonable or designed to promote conservation.
[4] This is the second time in recent years that a majority of this Court has acted to sharply restrict the regulatory authority of the Commission. See Tampa Electric Co. v. Garcia, 767 So.2d 428 (Fla.2000).
[5] A copy of the opinion is attached hereto as Appendix "A".