966 So.2d 319 (2007)
Victor Tony JONES, Appellant,
v.
STATE of Florida, Appellee.
No. SC04-726.
Supreme Court of Florida.
May 24, 2007.
Rehearing Denied September 24, 2007.
*320 Neal A. Dupree, Capital Collateral Regional Counsel  Southern Region, and William M. Hennis, III, Litigation Director CCRC-South, Fort Lauderdale, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, Florida, and Sandra S. Jaggard, Assistant Attorney General, Miami, FL, for Appellee.
*321 PER CURIAM.
Victor Tony Jones, who was convicted of murder and sentenced to death, appeals an order denying his successive motion to vacate the judgment and sentence and an order concluding that he is not mentally retarded. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Jones raises two claims: (1) that the court erred in concluding that the second prong of the definition of mental retardation requires a current assessment of adaptive functioning; and (2) that the trial court erred in concluding that Jones is not mentally retarded. We affirm the circuit court's orders.

I. STATEMENT OF FACTS
On December 19, 1990, Jones, on his second day of work, killed his two employers, Matilda and Jacob Nestor, in their office. Jones v. State, 652 So.2d 346 (Fla.), cert. denied, 516 U.S. 875, 116 S.Ct. 202, 133 L.Ed.2d 136 (1995). Before he died, Jacob Nestor shot Jones in the head. Jones needed surgery to remove the bullet. He was convicted of two counts of first-degree murder and two counts of armed robbery.

A. Competency, Mitigation, and the Penalty Phase
At a competency hearing held before the penalty phase, several doctors testified: two psychiatrists and two neuropsychologists. During the penalty phase, Dr. Jethro Toomer, a psychologist who evaluated Jones, testified for the defense that Jones was abandoned by his mother, that the statutory mitigator of extreme mental or emotional disturbance applied, and that Jones suffered from borderline personality disorder. Dr. Charles Mutter, a forensic psychiatrist, testified for the State to rebut this testimony. At the Spencer[1] hearing, Dr. Hyman Eisenstein testified for the defense that as a result of the gunshot wound, Jones was not competent. No one testified that Jones was mentally retarded. Laura Long, an aunt of Jones who raised him, testified that he performed well in elementary school and was well behaved until about age 11 when he became a runaway and used drugs. The court found three aggravators, but no mitigation, and sentenced Jones to death for both murders. We affirmed. Jones, 652 So.2d at 349.

B. Mitigation and the Postconviction Motion
Jones subsequently filed a motion for postconviction relief pursuant to rule 3.850, Florida Rules of Criminal Procedure, raising almost two dozen claims. Jones v. State, 855 So.2d 611, 614-15 & 615 n. 1 (Fla.2003). The circuit court limited the evidentiary hearing to Jones's "claims of ineffective assistance of counsel related to a voluntary intoxication defense, mitigation, and appellant's pretrial competency." Id. at 615. At that hearing, Jones presented the testimony of two relatives: his sister Pamela Mills and his cousin Carl Leon Miller. They testified to physical childhood abuse Jones suffered when they all lived with their aunt, Laura Long. Jones's trial counsel testified that he was successful only in contacting Jones's aunt, grandmother, and third-grade teacher, who largely provided a positive early childhood history for Jones. Jones's third-grade teacher, Mrs. Vera Edwards, testified at the evidentiary hearing that Jones was "well prepared for school every day," well behaved, and of "a little above average" intelligence, and he demonstrated no signs of being physically abused. School records *322 indicated that in later years, when Jones began using drugs and skipping school, his grades drastically slipped. Several experts who had examined him testified on his behalf. Again, no one testified that he was mentally retarded. The circuit court found some of the testimony not credible and held that defense counsel's decision regarding which experts would testify at trial was strategic and reasonable. Jones, 855 So.2d at 618. This Court affirmed the circuit court's denial of relief. Id. at 615-16.

C. The Hearing on Mental Retardation
Jones next filed a successive postconviction motion, alleging that he is mentally retarded. At the time, Florida Rule of Criminal Procedure 3.203, which governs this issue, was not final, and the circuit court summarily denied Jones's motion. Jones appealed the order, arguing that he was entitled to a hearing under Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and rule 3.203. We relinquished jurisdiction for the court to hold an evidentiary hearing.
At the hearing, three witnesses testified: one (Dr. Eisenstein) on behalf of Jones, and two (Dr. Enrique Suarez and Lisa Wiley, a psychological specialist with the Department of Corrections) on behalf of the State. The parties stipulated that evidence from the evidentiary hearing would be considered cumulatively with the evidence from prior proceedings.
The evidence established the following: Jones was born in 1961. At a young age, he and his siblings were taken from his alcoholic mother and sent to live with different relatives. Jones and his sister Pamela lived with their aunt Laura Long in Miami. Jones ran away a few times, and at age 11 stowed away on an airplane and flew to New York City, where he lived for a time with his alcoholic mother. At age 13, he overdosed and was admitted to intensive care in Miami, and in 1975, at age 14, at the request of the juvenile court he was admitted to Jackson Memorial Hospital for psychiatric evaluation. With the observation that Jones had a "completely normal mental status" during his stay, he was discharged with a diagnosis of "unsocialized aggressive reaction of adolescence," with no psychiatric treatment needed. A hospital document indicated that Jones previously had been labeled at a juvenile facility as having borderline mental retardation, but no documentation supported the statement.
School records indicated that Jones was in regular classes. He earned mostly Cs in grades one and two, with some As and Bs in English and writing. His third-grade teacher reported that he was of "a little above average intelligence" and did well in school. In seventh grade he again earned Cs with Bs in English. In eighth grade as he began using drugs, skipping school, and having disciplinary problems, his grades dropped precipitously. Jones dropped out of high school at age 16. During his teenage years, he was in several juvenile placements over various periods of time.
After discharge from the State juvenile system in 1978, Jones stayed in Miami a short time, working as a waiter. Then he hitchhiked alone to Texas, supporting himself by working various jobs and selling drugs. Then, he flew to San Francisco, where he supported himself mostly through robberies. Jones returned to Miami in 1979 for a short time, and then traveled to Atlanta, where he lived for several years, working various jobs over time, including bouncer and waiter. During that time, he had several girlfriends, and lived for a time with a "common law wife." He returned to Miami in 1986, where he supported himself by cutting *323 lawns and selling drugs. Then, in 1989 he was arrested for armed robbery, and he was under sentence of imprisonment in 1990 when, at the age of 29, he committed the murders of the Nestors and was shot in the head.
Various doctors administered either the WAIS-R (Wechsler Adult Intelligence Scales) or WAIS-III intelligence tests between 1991 and 2005, and Jones's IQ scores were as follows: 72, 70, 67, 72, and 75. The doctors also administered other tests, including the MMPI (Minnesota Multiphasic Personality Inventory) and the WRAT (Wide Range Achievement Test).
Dr. Eisenstein, a neuropsychologist, had been involved in Jones's case beginning with the trial and during those fifteen years had tested and interviewed Jones on various occasions. Admitting that he had not previously diagnosed Jones as mentally retarded, he nevertheless opined that he was. Eisenstein testified that the criteria for diagnosing mental retardation are an IQ score of below 70, two areas of deficiency in adaptive skills, and onset before age 18. Acknowledging that Jones's scores were higher than that, the expert stated that the applicable diagnostic manual allowed for a mental retardation diagnosis when the IQ fell in the 70 to 75 range if the other two criteria are met. Accordingly, Eisenstein conducted a "retrospective diagnosis" to assess Jones's adaptive levels before age 18. He concluded that Jones's adaptive skill levels as an adult were not part of the criteria defining mental retardation.
Eisenstein determined that before age 18 Jones had significant deficits in adaptive functioning in the areas of (1) communicationfamily members said Jones was not articulate and was a slow learner; (2) academic functionfamily members said he was mentally slow and needed special schooling, and some school records showed failing grades; (3) self-directionJones's sister said Jones needed her help when he was young and Eisenstein opined that Jones's older, common law wife served as a "mother figure or a caregiver to take care of him"; (4) social interpersonal skillsfamily members said Jones was a loner; and (5) health and safetyfamily members said Jones did not take care of himself as a child, and he had numerous medical concerns that no one addressed. Accordingly, Eisenstein concluded that because Jones met two prongs of the definition (onset before age 18 and deficiencies in adaptive skills), Jones's borderline IQ scores did not invalidate his diagnosis of mental retardation.
Lisa Wiley, a Department of Corrections psychological specialist with a masters degree in clinical psychology, knew Jones from 1993 to 2005 when she conducted death row evaluations and counseling. She testified that Jones always kept a neat cell and demonstrated polite and appropriate behavior. He spoke rationally, coherently, and logically, and she never thought he was mentally retarded. She regularly met with inmates such as Jones who were on psychotropic medications, and she helped process death row inmates' requests for assistance. Jones filed written requests for assistance, such as a request to have his television repaired, and filed written grievances. In 2004, Jones wrote the following grievance complaining that money sent from someone in Europe had not been credited to his inmate account:
Dear Sir, This is regarding I've had money transferred through a bank in Belgium and back on the Fri th13-04 I received a bank receipt from them  where as I have never had my money put in my account or received a deposit receipt from Tallahassee and I've tried to get a copy of the receipt made, but could not, so I'm sending you my receipt. *324 So if you could please help me maybe after you see it you could make a copy and fax it to the bank, But according to the date, there is no reason why my money shouldn't be in my account, would appreciate your help.
Dr. Suarez, a psychologist, examined Jones for the State. He also defined the criteria for mental retardation as significantly subaverage intellectual functioning, concurrent deficits in present adaptive functioning, and onset before age 18. He disagreed with Dr. Eisenstein, however, that the test for mental retardation limits the inquiry into adaptive functioning to the years before age 18. Dr. Suarez stated that according to the applicable diagnostic manual, the inquiry into adaptive functioning must consider present circumstances because true mental retardation is lifelong. A child deemed mentally retarded actually may be experiencing a developmental delay. With appropriate training and skill development, that individual may, as an adult, no longer have the level of impairment required for the diagnosis. Thus, a diagnosis of an adult, based solely on the person's adaptive functioning as a child, is invalid. Dr. Suarez stated that the purpose of the onset-before-age-18 requirement is to account for other causes. For example, an adult who suffered a head injury may test as mentally retarded, but without onset before age 18, that would not be the clinical diagnosis.
Suarez interviewed Jones about his life history to the present, administered several tests, including achievement tests, nonverbal intelligence tests, memory tests, and the Adaptive Behavior Assessment System (ABAS). Dr. Suarez found Jones's test scores on several tests indicated that he was purposely not performing his best, and on the MMPI he found that Jones was malingering. On the ABAS administered to DOC staffers familiar with Jones's current abilities, Jones's adaptive functioning scores reflected a score of average, although all three staffers rated Jones's social skills as borderline or below average. Dr. Suarez also examined and considered the medical, school, prison, and testing records related to Jones, including those of the experts who previously examined Jones from the trial to the time of the hearing. Suarez concluded that Jones is not mentally retarded. Jones functions at least in the borderline to low average intelligence range, but borderline does not equal mental retardation. Dr. Suarez further opined that it was highly probable that Jones has mild to moderate cognitive deficits due to brain injury from being shot in the head in 1990. This suggested that Jones's pre-injury level of intelligence was higher than his present level.
Regarding his interview with Jones, Suarez found Jones to be articulate and noted Jones's vocabulary, internally consistent sentences, detailed and insightful narration, and his understanding of concepts. For example, as Jones recounted abuse he suffered as a child, Dr. Suarez asked him if the abuse was ever reported to the authorities. Jones responded, "They had a family code thing. They kept it secret like my cousin making my sister pregnant." In prison, Jones understood his own medical conditions, e.g., diabetes, high blood pressure, and high cholesterol, knew his medications, and was allowed to keep the medications in his cell and self-administer them on schedule. Jones recognized when he had medical problems, and requested help.[2] As to the onset before age 18 prong, Dr. Suarez testified that Jones's *325 grades were good in school until junior high when his failing grades matched his poor conduct and effort. He also noted that for an eleven-year-old to stowaway on an airline "takes a tremendous amount of sophistication." In short, Jones's demonstrated abilities, communication skills, and evident high degree of thought and daily functioning did not support a diagnosis of mental retardation.
Finding "no credible evidence" to support Jones's claim, the circuit court held Jones did not meet even one of the three statutory requirements for mental retardation. Jones appealed, raising the issues discussed below.

II. DETERMINING ADAPTIVE FUNCTIONING
Jones first argues that the trial court erred in rejecting his expert's opinion that the second prong of the mental retardation definition requires a "retrospective" determination of his adaptive functioning before age 18, instead of an assessment of Jones's adaptive functioning as an adult. He also contends that the trial court erred in finding that Jones did not meet this prong of the definition. We disagree.
The Supreme Court has held that it is unconstitutional to execute a person with mental retardation; however, it left to the States the task of defining that term. Atkins v. Virginia, 536 U.S. 304, 317, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Florida defines mental retardation in pertinent part as follows:
(1) As used in this section, the term "mental retardation" means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18. The term "significantly subaverage general intellectual functioning," for the purpose of this section, means performance that is two or more standard deviations from the mean score on a standardized intelligence test specified in the rules of the Department of Children and Family Services. The term "adaptive behavior," for the purpose of this definition, means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community.
§ 921.137(1), Fla. Stat. (2005) (emphasis added); accord Fla. R.Crim. P. 3.203(b) (containing the same definition). Thus, we have stated that diagnosis of mental retardation requires three findings: (1) significantly subaverage general intellectual functioning; (2) concurrent deficits in adaptive behavior; and (3) onset of the condition before age 18. See Burns v. State, 944 So.2d 234, 245 (Fla.2006).
At the hearing in this case, both Drs. Eisenstein and Suarez agreed that these three prongs must be met. Dr. Eisenstein testified, however, that the third prong  onset before age 18limits the inquiry into the second  deficient adaptive functioning. He stated that in determining whether a person experiences deficits in adaptive functioning, only the person's childhood behavior is considered.[3]
To the extent that Jones argues that the statute and our rule require only a determination of a person's adaptive skills before age 18, we review the issue de novo. See Kephart v. Hadi, 932 So.2d 1086, 1089 (Fla.2006) ("The interpretation of a statute *326 is a purely legal matter and therefore subject to the de novo standard of review."), cert. denied, ___ U.S. ___, 127 S.Ct. 1268, 167 L.Ed.2d 92 (2007); Saia Motor Freight Line, Inc. v. Reid, 930 So.2d 598, 599 (Fla.2006) ("The certified conflict issue involves the interpretation of the Court's rules and is a question of law subject to de novo review."). As explained below, we find that the plain language of the statute precludes the defense expert's interpretation.
The first step in determining the meaning of a statute is to examine its plain language. Koile v. State, 934 So.2d 1226, 1230 (Fla.2006). When the language is clear and unambiguous, as it is here, we have no need to resort to rules of statutory construction to determine the legislature's intent. Id. at 1230-31(citing Lee County Elec. Coop., Inc. v. Jacobs, 820 So.2d 297, 303 (Fla.2002)). Further, words must be given their plain meaning and statutes should be construed to give them their full effect. Id.
Both Florida law and our rule state that the exception to the death penalty applies to a defendant who "is mentally retarded" or "has mental retardation." § 921.137(2), Fla. Stat. (stating no person may be sentenced to death "if it is determined in accordance with this section that the defendant has mental retardation"); Fla. R.Crim. P. 3.203(e) (providing for an evidentiary hearing to consider "the issue of whether the defendant is mentally retarded"). Thus, the question is whether a defendant "is" mentally retarded, not whether he was. Both the statute and our rule define mental retardation as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18." § 921.137(1), Fla. Stat. (2005) (emphasis added); Fla. R.Crim. P. 3.203(b). Jones does not dispute that the intellectual functioning component must be based on current testing. Moreover, his own expert based his determination of this prong largely on testing administered between 1991 and 2005, from the time Jones was 29 to the time of the rule 3.203 hearing. What Jones argues is that the second prong is concerned solely with an individual's adaptive behavior as a child under age 18. The legal definition, however, states that the intellectual functioning component must "exist[] concurrently with" the deficient adaptive behavior. The word "concurrent" means "operating or occurring at the same time." Merriam Webster's Collegiate Dictionary 239 (10th ed.2001). Jones's analysis would require us to ignore the plain meaning of the phrase "existing concurrently with" that links the first two components of the definition. The third prong"and manifested during the period from conception to age 18"  specifies that the present condition of "significantly subaverage general intellectual functioning" and concurrent "deficits in adaptive behavior" must have first become evident during childhood.
Further, as Jones admits, Florida's definition of mental retardation is consistent with the definition of the American Psychiatric Association, which provides the following diagnostic criteria for mental retardation:
A. Significantly subaverage intellectual functioning: an IQ of approximately 70 or below on an individually administered IQ test (for infants, a clinical judgment of significantly subaverage intellectual functioning).
B. Concurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group) in at least two of the following areas: communication, *327 self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.
C. The onset is before age 18 years.
American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 49 (4th ed. 2000) (DSM-IV). Thus, to the extent that Jones argues that the issue is not one of statutory construction but of an expert's interpretation of the DSM-IV, the argument fails as well. The DSM-IV states that the second criterion for mental retardation is "[c]oncurrent deficits or impairments in present adaptive functioning." (Emphasis added.) Dr. Eisenstein's testimony that in this phrase the word "present" actually refers to past, or childhood, adaptive functioning would impose an Alice-in-Wonderland definition of the word "present." See Lewis Carroll, Through the Looking-Glass (1872) ("When I use a word, it means just what I choose it to meanneither more nor less."), quoted in Hartford Ins. Co. of the Midwest v. Minagorri, 675 So.2d 142, 144 (Fla. 3d DCA 1996).
First, we note that the circuit court's task in this case was to apply the law, which is contained in the statute and rule cited above. With regard to expert opinion, however, the court has discretion to accept or reject such testimony. See Evans v. State, 800 So.2d 182, 188 (Fla. 2001) (applying an abuse of discretion standard to the trial court's determination of competency made after hearing conflicting expert testimony). The court rejected Dr. Eisenstein's testimony and accepted Dr. Suarez's testimony that the word "present" means "now." Dr. Suarez testified that the second prong of Florida's definition of mental retardation and the second criterion of the DSM-IV mean the same thing. As we explained above, we agree. Further, on cross-examination Jones asked the State's expert to explain the following passage from the DSM-IV:
Mental Retardation is not necessarily a lifelong disorder. Individuals who had Mild Mental Retardation earlier in their lives manifested by failure in academic learning tasks may, with appropriate training and opportunities, develop good adaptive skills in other domains and may no longer have the level of impairment required for a diagnosis of Mental Retardation.
DSM-IV at 47. Dr. Suarez explained that this statement illustrates that, because mental retardation is lifelong, a child may meet the criteria for the diagnosis because of developmental delays without being mentally retarded. Unless the person also meets the criteria as an adult, the individual is not mentally retarded. Thus, diagnosis of mental retardation in an adult must be based on present or current intellectual functioning and adaptive skills and information that the condition also existed in childhood. Accordingly, the trial court accepted Dr. Suarez's interpretation of the DSM-IV, which was consistent with Florida law, and did not abuse its discretion in rejecting Dr. Eisenstein's contrary opinion.
Next, Jones argues that Atkins essentially prohibits a determination of an individual's current adaptive skills if that person, like Jones, is in prison. He claims that adaptive functioning has to be determined from an individual's adaptive functioning in the "outside world." To the contrary, as we stated above, the Court in Atkins left the definition and determination of mental retardation to the States. See Atkins, 536 U.S. at 317, 122 S.Ct. 2242 (quoting Ford v. Wainwright, 477 U.S. 399, 416-17, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)). Moreover, the State's expert did not base his opinion solely on his interviews with prison guards. In determining that Jones was not deficient in adaptive *328 behavior, Dr. Suarez relied on his interview with and testing of Jones, his examination of records regarding Jones's life from his childhood to the time of the rule 3.203 hearing, and interviews and testing of DOC staffers who observed Smith on a regular basis. Thus, as Dr. Suarez admitted, while the adaptive skills test administered to DOC staff regarding Jones's adaptive functioning is not ideally suited to a prison environment, the test was not his sole source of information. Further, the evidence demonstrates that both in and out of prison, Jones understands and manages his own life.
In prison, Jones follows a daily exercise regimen of his own devising and uses improvised equipment to gain, according to Jones, the benefits of health and stress relief. He understands his various medical problems, the related medication, and self-administers it on schedule. He writes requests to see doctors, specifically defining his medical problems, and suggests changes in diet or medication. He manages the finances of his inmate account, including obtaining appropriate documentation, following up on money transfers from foreign countries, and filing grievances when he finds a discrepancy in the account. He keeps himself and his cell clean and orderly and visits the prison library twice a week. His language skills in writing, speaking, and other intellectual skills are strong in light of his dropping out of school at an early age. In addition, in the "outside world" as a young adult from age 18 to 29 (before he committed the murders), Jones traveled alone, lived in several states, and supported himself through various jobs. He had girlfriends at various times and for several years lived with a "common law wife," as he correctly termed her.
Jones insists that the statements his relatives gave Dr. Eisenstein about his childhood are the only valid evidence regarding his adaptive functioning. First, as we explained above, the adaptive functioning criterion is not limited to childhood, and, second, the validity of his relatives' statements is questionable. The statements Jones's Aunt Laura apparently gave Dr. Eisenstein directly contradicted her prior testimony at Jones's penalty phase, and the court in Jones's prior postconviction hearing found his sister Pamela's and his cousin Carl's testimony not credible. Further, these statements by relatives are contradicted by the record. For example, Jones's relatives said he was a slow learner who was placed in special classes. However, his elementary school teacher testified previously that Jones was a good student, who was in regular classes and earned good grades. Jones's school records support her statement. The record shows that Jones's failing grades in junior high coincide with his disciplinary problems and lack of effort. In addition, Jones's own detailed statements about his childhood contradict his relatives' statements.
Finally, Jones argues that the circuit court erred in finding that Jones "does not suffer from deficiencies in adaptive functioning." As illustrated by the foregoing discussion, competent, substantial evidence supports the trial court's determination. See Trotter v. State, 932 So.2d 1045, 1049 (Fla.2006) (finding that "competent, substantial evidence support[ed]" circuit court's determination that Trotter was not mentally retarded).

III. THE MENTAL RETARDATION DETERMINATION
Jones next argues that the circuit court erred in determining that he also did not meet the other two prongs of the mental retardation definitionsignificantly subaverage intellectual functioning and onset before *329 age 18and appears to contend that the court applied an incorrect standard of proof. We affirm the trial court's order.
Jones first argues that the trial court erred in concluding that because his IQ was consistently above 70, he did not meet the first prong of the mental retardation definition. Jones claims that mental retardation may be diagnosed in individuals with IQs between 70 and 75 when they exhibit significant deficits in adaptive behavior. First, we already have found the trial court's determination that Jones is not deficient in adaptive functioning to be supported by competent, substantial evidence. Insofar as this involves the application of Florida's statute, we find this claim also fails under the plain language of the statute.
Under Florida law, the first prong of a mental retardation determination requires that the person exhibit "significantly subaverage general intellectual functioning," and further defines that term as "performance that is two or more standard deviations from the mean score on a standardized intelligence test" specified by the Department of Children and Family Services. § 921.137(1), Fla. Stat. (2005). The Department in turn has designated the WAIS, the test administered to Jones, as an approved test. Fla. Admin. Code R. 65B-4.032. On the WAIS, a score of 70 is two standard deviations from the mean. Accordingly, under the plain language of the statute, "significantly subaverage general intellectual functioning" correlates with an IQ of 70 or below. See Zack v. State, 911 So.2d 1190, 1201 (Fla.2005) ("Under Florida law, one of the criteria to determine if a person is mentally retarded is that he or she has an IQ of 70 or below."). Jones's scores on the WAIS were as follows: 72 (1991), 70 (1993), 67 (1999), 72 (2003), and 75 (2005). In other words, the scores did not indicate "significantly subaverage general intellectual functioning." Further, each of these tests was administered after Jones was shot in the head when he murdered the Nestors. Dr. Suarez testified that his examination of the records and his testing of Jones indicated Jones's intelligence was probably higher before the head injury. Dr. Eisenstein, Jones's expert, testified that the head injury was a "major trauma" resulting in impairment of Jones's ability to concentrate and remain focused, and negatively affecting his perceptual processes. Further, none of the many doctors who examined Jones at trial and during prior postconviction proceedings, including Dr. Eisenstein, considered Jones to be mentally retarded. Thus, competent, substantial evidence supports the circuit court's finding that Jones did not meet the first prong of the mental retardation definition.
Next, Jones contends that the trial court erred in determining that he failed to meet the remaining prong of the mental retardation definition: manifestation or onset before age 18. Much of Dr. Eisenstein's "retrospective" diagnosis was focused on this prong. The expert's findings on this prong were based on statements from Jones's Aunt Laura that contradicted her trial testimony, information garnered from Jones's cousin and sisterwitnesses whom the circuit court previously found not credibleand information selectively drawn from Jones's records. As explained in our discussion of the previous issue, valid record evidence refuted claims that Jones was a slow learner in special classes who was unable to take care of himself.
Finally, Jones appears to claim that the circuit court should not have applied the clear and convincing evidentiary standard. We need not address this claim. In this case, the circuit court found that "[t]here is no credible evidence to suggest that Jones is mentally retarded." (Emphasis *330 added.) Thus, Jones did not present evidence sufficient to meet even the lesser standard of preponderance of the evidence. See Trotter, 932 So.2d at 1049 n. 5 (finding it unnecessary to address claim that clear and convincing standard was unconstitutional "because the trial court concluded that Trotter was not mentally retarded [under] either" standard).
In his reply brief, Jones raises for the first time a claim that that the trial court abused its discretion by appointing Dr. Eisenstein as an expert at defendant's request because the court was not "open to hearing and considering his testimony." First, this claim was not preserved for review. Further, because it was first raised in the reply brief, we need not address it. See Hall v. State, 823 So.2d 757, 763 (Fla.2002) ("Hall made no argument regarding equal protection in his initial brief; thus, he is procedurally barred from making this argument in his reply brief."); Fla. R.App. P. 9.210(d) ("The reply brief shall contain argument in response and rebuttal to argument presented in the answer brief."). In any event, the claim is meritless. Judgments of credibility are within the trial court's purview. The record indicates that the circuit court considered all the testimony, and its determination that Jones is not mentally retarded is not an indication otherwise. Accordingly, the court did not abuse its discretion by appointing Eisenstein. See Porter v. State, 788 So.2d 917, 923 (Fla.2001) (stating that regarding a trial court's decisions on questions of fact, credibility of witnesses, and evidentiary weight, "this Court will not substitute its judgment for that of the trial court").

IV. CONCLUSION
For the reasons discussed above, we affirm the circuit court's orders denying Jones's successive motion for postconviction relief and determining that Jones is not mentally retarded.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] See Spencer v. State, 615 So.2d 688 (Fla. 1993) (requiring trial court to hold a hearing after the penalty phase to afford the defendant and the State an opportunity to present additional evidence).
[2] In one request, Jones wrote: "I'm especially now very weak and constantly weak and sick on my stomach, and dizzy from blood sugar too high, and have not enough food which left me in coma like state, and I need to see the doctor ASAP."
[3] Dr. Eisenstein stated that "adaptive functioning has to address the issue of the individual before age 18" and that "at age 44, [Jones's] adaptive functioning, albeit important, . . . is not the criteria for defining and assessing mental retardation."