55 So.3d 487 (2010)
Dean KILGORE, Appellant,
v.
STATE of Florida, Appellee.
Dean Kilgore, Petitioner,
v.
Walter A. McNeil, etc., Respondent.
Nos. SC09-257, SC09-1552.
Supreme Court of Florida.
November 18, 2010.
Rehearing Denied February 17, 2011.
*492 Neal A. Dupree, Capital Collateral Regional Counsel, William M. Hennis, III, *493 Litigation Director, and Paul Kalil, Assistant CCR Counsel, Southern Region, Fort Lauderdale, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, FL, and Katherine V. Blanco, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
Dean Kilgore appeals the denial of his amended motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850. Through his postconviction motion, Kilgore challenges his capital murder conviction and sentence of death. Kilgore has also filed a petition for writ of habeas corpus, through which he alleges ineffective assistance of appellate counsel due to counsel's failure to raise several issues on direct appeal. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons discussed below, we affirm the trial court's denial of Kilgore's rule 3.850 motion and deny relief on his petition for writ of habeas corpus.

FACTS AND PROCEDURAL HISTORY

Background and the Direct Appeal Proceedings
Kilgore has been incarcerated most of his adult life. His entry into the Florida prison system began in 1970 when he was found guilty of, among other charges, three counts of aggravated assault with intent to kill. He was released from custody on September 30, 1977. On July 31, 1978, Kilgore broke into the home of Barbara Ann Jackson, shot and killed her boyfriend, and then kidnapped her.[1] As a result of that incident, in December 1978, Kilgore was convicted of first-degree murder (life sentence), kidnapping (life sentence), and armed trespass (five years). The death sentence challenged here arises from the February 13, 1989, murder of Emerson Robert Jackson. On direct appeal, this Court detailed the circumstances surrounding the murder as follows:
Kilgore was serving a life sentence for first-degree murder, a consecutive life sentence for kidnapping, and an additional consecutive five-year sentence at the Polk Correctional Institution when the events in the instant case took place.
On February 13, 1989, Kilgore and his homosexual lover, Emerson Robert Jackson, had a confrontation as Jackson was leaving his cell. Prior to the confrontation with Jackson, Kilgore waited outside Jackson's cell and smoked a cigarette with another inmate. Kilgore carried a homemade shank knife. Kilgore approached Jackson outside his cell and stabbed him three times. After the stabbing, Kilgore poured a caustic liquid onto Jackson's face and into his mouth. Jackson died as a result of the stab wounds. Kilgore went to the administration building immediately after the incident and told the guards, "I stabbed the bitch."
Kilgore was indicted for first-degree murder and possession of contraband by an inmate.
Kilgore v. State, 688 So.2d 895, 896-97 (Fla.1996).
In May 1989, Jeffrey Holmes was appointed to represent Kilgore in the trial for the murder of Emerson Robert Jackson. Holmes received what he "believed to be clear signals by the Judge that this was not a death-penalty case," and ultimately entered a plea of nolo contendere to first-degree murder on Kilgore's behalf. During the penalty phase, Holmes filed a *494 motion to appoint a second attorney to assist in the representation of Kilgore, but that motion was denied. Following the plea, the circuit judge in the Tenth Judicial Circuit imposed a death sentence. In the sentencing order, the trial court did not find any mitigating factors.
In the ensuing appeal, this Court relinquished jurisdiction to the trial court to determine the validity of the plea. Roger A. Alcott was appointed to represent Kilgore in that proceeding, and a circuit court judge from the Thirteenth Judicial Circuit invalidated Kilgore's initial plea and ordered that the trial be returned to the Tenth Judicial Circuit for a new disposition. Holmes, who was reinstated as counsel for a short period following the order which set aside the plea, filed a motion requesting the circuit court to impose a life sentence, but the motion was denied.
On April 23, 1993, Alcott was appointed to provide representation during the subsequent retrial. The case was also reassigned to a different circuit court judge from the Tenth Judicial Circuit. A unanimous jury in the Tenth Judicial Circuit found Kilgore guilty on both the first-degree murder and kidnapping charges, and by a vote of nine to three, the jury recommended that the death penalty be imposed. See Kilgore, 688 So.2d at 897. The circuit judge who presided at trial found two aggravating circumstances: (1) Kilgore was under sentence of imprisonment at the time he committed the murder;[2] and (2) Kilgore was previously convicted of a felony involving the use or threat of violence to the person.[3]See id. The judge also found two statutory mitigating factors: (1) Kilgore acted under the influence of extreme mental or emotional disturbance;[4] and (2) Kilgore's capacity to conform his conduct to the requirements of law was substantially impaired.[5]See id. The trial judge also found three nonstatutory mitigators: (1) Kilgore's extreme poverty as a child; (2) his lack of education; (3) and his poor mental and physical condition. See id. Although no particular weight was expressly assigned to each factor, the trial judge did find that the aggravating circumstances "far outweighed" the statutory and nonstatutory mitigating circumstances. Ultimately, Kilgore was sentenced to death for the murder of Emerson Robert Jackson.
Kilgore raised six issues on direct appeal. See id. at 897-901.[6] This Court rejected each of these claims, affirmed Kilgore's conviction for first-degree murder, and affirmed the imposition of the death sentence. See id. at 901.

Postconviction Proceedings

Pre-Evidentiary Hearing Developments
The case currently under review is Kilgore's first postconviction proceeding before *495 this Court. On June 8, 1998, Kilgore filed a "shell" motion to vacate judgment of conviction and sentence entered in the Tenth Judicial Circuit. Sometime thereafter, Kilgore's trial counsel, Alcott, was appointed to be a judge on the Tenth Judicial Circuit. Kilgore filed a motion to disqualify the circuit judge in the Tenth Judicial Circuit assigned to his case, which was granted, and Judge Rogers Padgett of the Thirteenth Judicial Circuit was appointed to preside over the postconviction proceedings.
Kilgore subsequently filed an amended motion to vacate judgment of conviction and sentence which raised twenty-seven claims, many of them with multiple sub-claims.[7] The postconviction court held a Huff[8] hearing, and on May 4, 2004, the postconviction court issued an order that summarily denied claims I, II (in part), III, IV (in part), V (in part), VI (in part), IX-XIV, XV (in part), XVI-XIX, XX (in part) XXI, and XXII-XXVI, and granted an evidentiary hearing for claims II (in part), IV (in part), V (in part), VI (in part), VIII, XV (in part), and XX (in part)[9]. The court reserved ruling on claims VII and XXVII.

June 2005 Evidentiary Hearing
The postconviction court held its first evidentiary hearing on Kilgore's rule 3.850 *496 motion from June 13, 2005, through June 15, 2005. During that hearing, postconviction counsel called upon a number of Kilgore's siblings to testify who did not testify at the 1994 trial. Most of the evidence revisited Kilgore's childhood and essentially enhanced much of the testimony from the penalty phase of Kilgore's jury trial. Evidence during the postconviction proceedings also introduced details with regard to Kilgore's time spent at the Oakley Training School (Oakley), a juvenile detention facility in rural Mississippi. The evidence detailed the extreme conditions Kilgore experienced at Oakley, specifically that he was institutionalized and frequently beaten.
The 2005 evidentiary hearing also revisited the murder of Emerson Robert Jackson. The evidence established that Emerson Robert Jackson had a reputation for taking advantage of inmates and toying with them emotionally. Jackson was notorious for being sexually involved with inmates and then ending his relationships with them, which caused many different inmates to resent him and threaten him with physical violence. Jackson was not liked by many inmates and was often the subject of death threats.
The testimony of the inmates presented against Kilgore during the 1994 proceedings was also called into question through evidence presented during the evidentiary hearing. There was testimony that alcohol, drugs, and weapons were readily available to inmates in prison. For this reason, many of the witnesses who testified at Kilgore's 1990 and 1994 trials openly admitted that they were drunk or high at the time of the murder. Each of the witnesses also had received dozens of disciplinary reports filed against them during their time in prison. Two of the inmates were offered deals from the State for their testimony; however, this information was not revealed during the 1990 or 1994 trials.
Finally, effectiveness of trial counsel during the 1994 trial was explored during the evidentiary hearing. The evidence established that Alcott did not review the entire record from the 1970 and 1978 trials, but Alcott asserted that it was not a customary practice for counsel to do so in capital cases at the time. Although he did not conduct any depositions for the 1994 trial, Alcott testified that he read all of the depositions conducted by his predecessor, Jeffrey Holmes, and did not think it was necessary to re-depose the witnesses. He also filed only two pretrial motions because he approached the case from the viewpoint that prior counsel, Holmes, was a capable defense attorney and that Holmes would have made motions during the first trial if they were necessary. At one point during the 1994 jury trial, Kilgore knocked over the defense table and Alcott made comments on the record about the possible need for a competency hearing, but ultimately never filed a motion to have such a hearing. With regard to voir dire, Alcott admitted that he did not ask for individual voir dire on the issues of race or homosexuality, but made a judgment call at the time that individual voir dire was unnecessary. Further, he did not believe that the trial judge had any racial bias whatsoever.
Alcott also defended his decision to not ask the court to appoint co-counsel for the 1994 trial. He testified that during that time it was not a customary practice to have two trial attorneys on a capital case. In fact, Alcott asserted that it was a strategic decision not to request co-counsel, as he did not want the jury to be exposed to a new face during the penalty phase. When given the American Bar Association's guidelines, which recommend that state capital cases should have at least two competent attorneys, he claimed that at the *497 time of the trial in this case, those guidelines were "aspirational goals."
Alcott asserted that all of his preparatory decisions with regard to witnesses and evidence related to the prison were strategic in nature. His defense strategy was to disprove the premeditation element of the charge, not the fact that Kilgore actually committed the murder. Accordingly, it was not necessary for him to solicit testimony that challenged the murder itself, but only the premeditation component. Further, Alcott testified that he made the conscious decision to not obtain an investigator because the murder happened in an institutional setting. Alcott admitted that he did not obtain any Florida Department of Corrections files on the inmate witnesses. Although he never received or reviewed the files, Alcott solicited the prior criminal history of many of the inmate witnesses through examination during trial.
The only research that Alcott conducted with regard to Kilgore's childhood and upbringing consisted of interviewing two of Kilgore's siblings, reviewing the limited files received from prior counsel, and interviewing Kilgore. At the 2005 evidentiary hearing, Alcott openly admitted that he did not spend much time interviewing the siblings. The two siblings he did interview testified that Alcott's contact was minimal at best. Alcott also admitted that he never interviewed Barbara Ann Jackson, the individual who was allegedly sexually involved with Kilgore and kidnapped by him in 1978. Alcott testified that he did not hire an independent investigator to research Kilgore's background in Mississippi because he did not think it was necessary to prove his case. Further, although most of Kilgore's siblings and family lived in the Lakeland, Florida area, Alcott did not make any effort to contact any of the siblings other than the two that were interviewed for trial. Even though these alleged deficiencies occurred, the trial court concluded both statutory mental health mitigators and multiple nonstatutory mitigators directly related to Kilgore's impoverished childhood had been established. See Kilgore, 688 So.2d at 897.
Alcott hired only one mental health expert for the 1994 trial to supplement the expert testimony solicited for the 1990 trial. Alcott did, however, have access to the records and experts from the 1990 trial. Alcott testified that he hired Dr. Henry Dee because he had used him in prior felony cases and believed that Dr. Dee was an excellent witness. Dr. Dee testified that he never discussed Kilgore's potential mental retardation with Alcott. He did, however, testify during the 1994 trial with regard to Kilgore's organic brain damage.
Finally, the mental health experts who testified during the 2005 evidentiary hearing, including Dr. Dee, all stated that the new information obtained after the trial with regard to Kilgore's childhood and mental development would have been relevant during the 1994 trial. The new information included the fact that most of Kilgore's mental disabilities can be attributed in some way to chemical, substance, or alcohol abuse. Further, the evidence presented by defense experts during the postconviction hearing revealed that Kilgore's mental deficits can be attributed to a severe case of borderline personality disorder, which can result in outbursts of anger, rage, and explosiveness. Kilgore's diabetes, which likely causes severe vascular problems, led him to a peripheral neuropathy condition. The evidentiary hearing also revealed the medical opinion of multiple experts that Kilgore suffers from institutionalization.

January 2007 Mental Retardation Evidentiary Hearing
In August 2005, less than one month after the initial evidentiary hearing, Kilgore *498 filed an amendment to his postconviction motion, specifically amending claim VI and adding claim XXVIII, in response to this Court's promulgation of Florida Rule of Criminal Procedure 3.203. The postconviction court appointed Dr. Hyman Eisenstein, who previously testified during the 2005 evidentiary hearing as an expert for the defense, and Dr. Michael Gamache as an expert for the State. The postconviction court held a second evidentiary hearing from January 22, 2007, through January 23, 2007. The defense presented the testimony of Dr. Eisenstein, Dr. Dee, and Katrina Mcnish (Capital Collateral Regional Counsel investigator). The State presented Dr. Michael Gamache. The testimony of these witnesses, along with selected testimony from the 2005 evidentiary hearing, addressed information relevant to the issue of mental retardation and to this appeal.
The Wechsler Adult Intelligence Scale (WAIS) has been administered to Kilgore on six separate occasions. Kilgore received the following full-scale IQ scores: 76 (Dr. William KremperAugust 1989), 84 (Dr. CiotolaMarch 1990), 67 (Dr. DeeMarch 1994), 75 (Dr. Eisenstein August 2000), 74 (Dr. DeeOctober 2004), 85 (Dr. GamacheMay 2006).
According to defense expert Dr. Eisenstein, the full-scale IQ scores of 74, 75, and 76 are likely most representative of Kilgore's actual IQ. The scores are in the same range and fall between the other three outliers and are significant to his ultimate opinion. Dr. Eisenstein administered a memory malingering test as part of the administration of the WAIS and produced results that, in Dr. Eisenstein's opinion, indicated that Kilgore was not trying to manipulate the results.
Although the practice effect was likely an issue for each administration of the WAIS after the first, it was perhaps the most significant in Dr. Ciotola's administration due to its close proximity in time (six months) to the previous administration. In fact, Dr. Ciotola indicated in his report that Kilgore's score of 84 was likely affected by the practice effect.
The experts opined that Dr. Dee's initial administration of the WAIS was not indicative of Kilgore's actual IQ. It is of great significance that through his testimony during the 2007 evidentiary hearing Dr. Dee himself discredited his initial administration of the exam. He explained that he was giving the WAIS as part of a neuropsychological evaluation, not as part of a mental retardation evaluation. In his view a full-scale administration was unnecessary.
The defense experts opined that Dr. Gamache's administration of the WAIS did not appear to be a reliable score. First, as explained by Dr. Dee, the currently accepted practice is to administer the entire test during forensic evaluations. Dr. Gamache only administered a prorated version of the WAIS. Dr. Eisenstein also discredited Dr. Gamache's findings, opining that a "prorated IQ, of course, is never as reliable as a full-scale IQ, which is now why the standard in forensic evaluation is to administer the entire test." The practice effect is also increasingly significant with each new administration of the exam, and that likely had an effect on Dr. Gamache's administration of the WAIS. Finally, at the time Dr. Gamache administered his WAIS, Kilgore had just entered the "55 plus" category, which automatically increases the IQ score by five to six points simply because of one's age. Had Dr. Gamache administered the exam only a few months earlier, Kilgore's IQ score would have been a 79, even with all of the flaws associated with the administration.
Dr. Eisenstein, an expert for the defense, testified that Kilgore met the criteria *499 for mental retardation as defined by Florida statute. When asked if he reached the same conclusion, Dr. Dee said, "Well, there is nothing that [Dr. Eisenstein] or I found that is inconsistent with that." Dr. Gamache did not believe that Kilgore met Florida's definition for mental retardation.

Final Order Denying Postconviction Relief
On December 3, 2008, the postconviction court denied Kilgore's motion to vacate judgment of conviction and sentence. With regard to Kilgore's mental retardation claim, the postconviction court found that Kilgore had not met the Florida criteria for "significantly subaverage general intellectual functioning," and thus did not address the other two prongs for establishing mental retardation under Florida law. The postconviction court also found that
[t]he testimony regarding Defendant's early life is largely cumulative where the defense penalty phase witnesses testified regarding the family's poverty and work as sharecroppers, Defendant's lack of education, physical abuse by his mother, Defendant's and his family's history of alcohol abuse, drinking moonshine as a child and possible exposure to lead from the moonshine, effects of his diabetic condition, head injuries and frequent beatings as a juvenile.
Ultimately, the postconviction court denied relief on all 27 claims. This appeal follows.

ANALYSIS

Ineffective Assistance of Counsel
Kilgore first contends that the postconviction court should have ordered a new trial based on the alleged ineffectiveness of trial counsel. Following the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has explained that to establish an ineffective assistance of counsel claim, two requirements must be satisfied:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986) (citations omitted). Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the trial court's factual findings that are supported by competent, substantial evidence, but reviewing the trial court's legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla. 2004).
There is a strong presumption that the performance of trial counsel was not ineffective. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689, 104 S.Ct. 2052. The defendant has the burden to "overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). We have held that "strategic decisions do not constitute ineffective *500 assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000).
With respect to the investigation and presentation of mitigation evidence, the United States Supreme Court observed in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), that "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case." Id. at 533, 123 S.Ct. 2527. Rather, in deciding whether trial counsel exercised reasonable professional judgment with regard to the investigation and presentation of mitigation evidence, a reviewing court must focus on the reasonableness of the investigation that resulted in the decision of counsel not to introduce certain mitigation evidence. See id. at 523, 123 S.Ct. 2527; Strickland, 466 U.S. at 690-91, 104 S.Ct. 2052. When making this assessment, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Wiggins, 539 U.S. at 527, 123 S.Ct. 2527.
An attorney can almost always be second-guessed for not doing more. However, this is not the standard by which counsel's performance is to be evaluated under Strickland. Deficient performance involves "particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards." Maxwell, 490 So.2d at 932.

Failure to Adequately Investigate and Prepare During Guilt Phase
Kilgore makes eight specific allegations that trial counsel was ineffective due to his failure to adequately investigate and prepare Kilgore's defense. Specifically, Kilgore alleges that trial counsel was ineffective due to his failure to (1) request co-counsel; (2) spend enough time preparing for trial; (3) spend enough time communicating with Kilgore; (4) move for the appointment of Dr. Dee until just days before trial; (5) move for the appointment of an investigator; (6) file any new motions other than the motion requesting the appointment of Dr. Dee; (7) move for the recusal of all judges of the Tenth Judicial Circuit Court based on Judge Strickland's serving as a material witness; and (8) move for change of venue or recusal of all judges of the Tenth Judicial Circuit Court based on racism and bias of the venue and court. We conclude that Kilgore has failed to demonstrate ineffective assistance on any of these claims.
First, Kilgore alleges that trial counsel was ineffective for failing to request a second lawyer to assist him, that this failure amounts to deficient performance, and that the failure operated to the extreme prejudice of Kilgore. The postconviction court found that Kilgore failed under the second prong of Strickland due to his failure to allege how he was prejudiced by trial counsel's failure to request the appointment of co-counsel. We agree. This Court has explicitly refused to adopt a rule that would automatically require the appointment of two attorneys in all capital cases. See Ferrell v. State, 653 So.2d 367, 369-70 (Fla.1995). Accordingly, for a defendant to overcome the strong presumption against ineffectiveness when basing an ineffectiveness claim on a failure to request co-counsel, the claimant must establish that the failure was outside the broad *501 range of reasonably competent performance under prevailing professional standards, and that he was actually prejudiced by the alleged failure. See Maxwell, 490 So.2d at 932. Here, Kilgore has established neither, and thus we deny relief on this claim.
Second, Kilgore alleges that trial counsel was ineffective for failing to properly prepare the case prior to trial. However, as the postconviction court correctly noted in its final order, Kilgore has failed to allege and prove how he was prejudiced by this supposed failure. We deny relief on this claim.
Third, Kilgore alleges that trial counsel was ineffective for failing to sufficiently communicate with Kilgore. The postconviction court, relying on Rosemond v. State, 433 So.2d 635 (Fla. 1st DCA 1983), and Byrd v. State, 243 So.2d 1 (Fla. 3d DCA 1971), held that brevity of consultation is not grounds for postconviction relief. We agree. Even if it is established that trial counsel's communication with his client was brief, a defendant maintains burden of establishing actual prejudice. Kilgore has failed to prove, or even allege, how he was prejudiced by this supposed deficient performance. No relief is warranted on this claim.
Fourth, Kilgore alleges that trial counsel was ineffective for failing to move for the appointment of a mental health expert until just weeks before trial. After granting an evidentiary hearing on this issue, the postconviction court found that Kilgore had failed to establish the prejudice prong of Strickland. After carefully reviewing the record, we believe that competent, substantial evidence exists to support the postconviction court's finding. Kilgore never specified how he was prejudiced by the allegedly late appointment of Dr. Dee. Further, there is nothing in the record that establishes that Dr. Dee was hindered by his allegedly late appointment. To the contrary, the record reflects that Dr. Dee and trial counsel had worked together previously and that trial counsel was very familiar with how Dr. Dee operated as an expert witness. The record further reflects that Dr. Dee benefited from the testimony of three additional experts who testified during the 1990 trial. Accordingly, we deny relief on this claim.
Fifth, Kilgore alleges that trial counsel was ineffective for failing to move for the appointment of an investigator. After granting an evidentiary hearing on this issue, the postconviction court found that Kilgore failed to establish how trial counsel performed deficiently as required by Strickland. During the 2005 evidentiary hearing, both the first defense counsel and the second defense counsel independently testified that they did not request the appointment of an investigator because in their independent judgment no investigation was needed. The postconviction court found the testimony of both individuals to be credible and that a reasonable strategic decision was made not to request funds for an investigator. We believe that competent, substantial evidence exists to support the trial court's finding and thus deny relief on this claim.
Sixth, Kilgore alleges that trial counsel was ineffective for failing to file any new motions during the second trial, except for the motion to appoint a single medical expert. The postconviction court denied relief on this claim due to Kilgore's failure to specifically allege what motions trial counsel should have filed or how he was prejudiced by trial counsel's failure to file any motions. To succeed on a claim of ineffective assistance of counsel, the "claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably *502 competent performance under prevailing professional standards." Maxwell, 490 So.2d at 932. Kilgore has failed to identify a single specific motion that trial counsel should have presented and relief is not warranted for this claim.
Finally, Kilgore alleges that trial counsel was ineffective for failing to move for the recusal of all judges of the Tenth Judicial Circuit Court. Specifically, Kilgore claims that trial counsel should have moved to recuse all of the judges of the circuit court due to one of the judges serving as a material witness in the interim proceedings. Kilgore also alleges that recusal was appropriate because the jury pool in the Tenth Circuit is racist. The postconviction court found that Kilgore failed to meet the second prong of Strickland on each claim in that he failed to establish how he was prejudiced by trial counsel's alleged failures. Competent, substantial evidence exists to support this finding of the trial court. Accordingly, no relief is warranted on this claim.

Failure to Adequately Voir Dire
Kilgore next claims that trial counsel's questions during voir dire with regard to issues of race and homosexuality were insufficient. Specifically, Kilgore argues that trial counsel failed to (1) request individual voir dire on the issues of homosexuality or race; (2) effectively inquire into issues of bias concerning homosexuality or race; (3) elicit meaningful responses indicative of prejudice; and (4) request additional peremptory challenges. To support these contentions Kilgore provides statements from eight of the twelve selected jurors that are indicative of anti-homosexual sentiment. The postconviction court granted an evidentiary hearing on these issues, but in its final order noted that trial counsel testified that in his judgment it was not necessary to conduct individual voir dire on homosexuality and felt comfortable with the jurors' responses with regard to this subject. Further, the postconviction court noted that trial counsel testified that he did not see the case as one of race and decided that he did not need to unnecessarily highlight racial issues. In denying relief, the court found that trial counsel made a reasonable strategic decision not to request individual voir dire or further inquire into issues of homosexuality or race. The postconviction court further found that Kilgore failed to show that counsel performed deficiently pursuant to Strickland or that there was prejudice.
The postconviction court found the testimony of trial counsel, that he chose not to pursue certain biases during voir dire for strategic purposes, to be credible. As a matter of law, the trial court is correct in that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone, 768 So.2d at 1048. The trial court's findings of fact are supported by competent substantial evidence. Accordingly, relief is not warranted for this claim.

Failure to Cross-Examine Effectively
Kilgore next alleges that trial counsel failed to cross-examine the State's witnesses effectively. Specifically, Kilgore alleges his trial counsel failed to (1) obtain the personnel files of any Polk County Sheriff's Office employees; (2) obtain prison records for the inmates who testified to obtain impeachment evidence; and (3) effectively cross-examine Barbara Ann Jackson.
The postconviction court granted an evidentiary hearing to determine whether a new trial was warranted based *503 on trial counsel's alleged failure to obtain the personnel records of Polk County Sheriff's Office employees. At the 2005 evidentiary hearing, the evidence called into question the credibility of the crime scene technician who investigated the scene of the murder of Emerson Robert Jackson. The postconviction court noted, however, that Kilgore failed to show how the technician conducted an erroneous or improper investigation, or that impeaching her testimony or credibility would have affected the outcome of the proceedings. We believe that competent, substantial evidence supports the postconviction court's finding that Kilgore has failed to prove how he was prejudiced by this supposed failure. Accordingly, Kilgore has failed to overcome the strong presumption against ineffective assistance and we deny relief on this claim.
Next, Kilgore claims that trial counsel was ineffective for failing to effectively cross-examine the inmates who witnessed the murder of Emerson Robert Jackson. During the 2005 evidentiary hearing, Kilgore presented evidence that contradicted the testimony of two inmates given at trial, and also disciplinary reports that could have been used during trial to impeach those witnesses. In its final order, however, the postconviction court found that none of this evidence would have been admissible. We believe that competent, substantial evidence supports this finding. Kilgore has thus failed to demonstrate that the proffered evidence had a reasonable probability of changing the outcome, which is a probability sufficient to undermine our confidence in the verdict. Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Accordingly, we deny relief on this claim.
Finally, Kilgore claims that trial counsel was ineffective for failing to effectively cross-examine Barbara Ann Jackson. During the evidentiary hearing, Kilgore presented the 1978 deposition testimony of Barbara Ann Jackson and two other witnesses that was inconsistent with Barbara Ann Jackson's testimony during the 1994 trial. Specifically, the depositions contradicted Barbara Ann Jackson's adamant denial of a sexual relationship with Kilgore during her testimony at the 1994 trial. The postconviction court found that although Alcott failed to review the 1978 transcripts, Kilgore failed to show how he was prejudiced. Specifically, the postconviction court noted that a police officer testified during the 1994 trial that Kilgore and Barbara Ann Jackson were in a sexual relationship and, during the penalty phase opening statements, the State conceded that the two were in a relationship. The postconviction court found that Kilgore has failed to show that anything obtained from the postconviction files would have impacted the outcome of the proceedings.
The postconviction court is correct in that Kilgore has failed to identify any errors in the crime scene technician's report or how he was prejudiced by trial counsel's failure to obtain the technician's personnel file. In his initial brief to this Court, Kilgore fails to identify with any specificity the individual whom trial counsel allegedly failed to investigate, instead making a blanket claim that his trial counsel was ineffective for failing to request files for any Polk County officers. Accordingly, Kilgore has failed to specifically "identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards." Maxwell, 490 So.2d at 932 (emphasis supplied). Kilgore has thus failed to overcome the "strong presumption that trial counsel's performance was not ineffective." Strickland, 466 U.S. at 690, 104 *504 S.Ct. 2052. Accordingly, we deny relief on this issue.

Failure to Adequately Investigate and Prepare During Guilt Phase
Kilgore alleges that trial counsel was ineffective due to his failure to adequately research Kilgore's childhood and mental health history during the 1994 penalty phase. Kilgore also alleges that his rights under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), were violated as a result of the failure to provide an adequate mental health evaluation. For the reasons discussed below, we deny relief on this claim.
"Counsel cannot be found ineffective for failing to provide cumulative evidence." Gudinas v. State, 816 So.2d 1095, 1108 (Fla.2002); see also Card v. State, 497 So.2d 1169, 1177 (Fla.1986) ("We refuse to render counsel ineffective for failing to proffer testimony that would have been entirely cumulative.") The essential question here, therefore, is whether the evidence presented during postconviction process is cumulative to the evidence presented during the 1994 penalty phase trial proceedings. After carefully reviewing the record, we find that competent, substantial evidence exists to support the postconviction court's finding that the evidence offered during the postconviction evidentiary hearing was cumulative.
There is no question that Kilgore suffered a difficult childhood. The evidence presented during postconviction was directed to this type of information. However, although the evidence presented during the postconviction hearing enhanced much of the evidence presented during the 1994 penalty phase, it did not really add anything new. The evidence presented during the 2005 evidentiary hearing painted Kilgore's childhood more clearly, but the basic elements that were relevant to mitigation were revealed and presented during the 1994 penalty phase proceedings. The only real "new" evidence presented was that related to the Oakley school itself, but the material did not establish anything dramatically different from that which was established during the 1994 trial. Therefore, Kilgore has failed to demonstrate that the proffered evidence had a reasonable probability of changing the outcome, which is a probability sufficient to undermine our confidence in the verdict. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Nor does the evidence introduced during the postconviction hearing so call into question the "fairness and reliability of the proceeding that confidence in the outcome is undermined." Maxwell, 490 So.2d at 932. Accordingly, we deny relief on this claim.
This result is consistent with the United States Supreme Court's recent decision in Bobby v. Van Hook, ___ U.S. ___, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009). In that case, the High Court explained:
Despite all the mitigating evidence the defense did present, Van Hook and the Court of Appeals fault his counsel for failing to find more. What his counsel did discover, the argument goes, gave them "reason to suspect that much worse details existed," and that suspicion should have prompted them to interview other family membershis stepsister, two uncles, and two auntsas well as a psychiatrist who once treated his mother, all of whom "could have helped his counsel narrate the true story of Van Hook's childhood experiences." [Van Hook v. Anderson] 560 F.3d [523] at 528 [(6th Cir.2009)]. But there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties. The ABA Standards prevailing at the time called for Van *505 Hook's counsel to cover several broad categories of mitigating evidence, see 1 ABA Standards 4-4.1, comment., at 4-55, which they did. And given all the evidence they unearthed from those closest to Van Hook's upbringing and the experts who reviewed his history, it was not unreasonable for his counsel not to identify and interview every other living family member or every therapist who once treated his parents. This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, cf. Wiggins, 539 U.S. at 525, 123 S.Ct. 2527, or would have been apparent from documents any reasonable attorney would have obtained, cf. Rompilla v. Beard, 545 U.S. 374, 389-393, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). It is instead a case, like Strickland itself, in which defense counsel's "decision not to seek more" mitigating evidence from the defendant's background "than was already in hand" fell "well within the range of professionally reasonable judgments." 466 U.S., at 699, 104 S.Ct. 2052.
Id. (some citations omitted) (emphasis supplied).
This ineffective assistance of counsel claim appears to be a veiled attempt to relitigate the weight that the trial court assigned to the mental health mitigators found in the sentencing order. This issue, however, was already addressed by this Court on direct appeal:
As previously recited, the trial judge found that two statutory mitigating factors were proven: (1) Kilgore acted under the influence of extreme mental or emotional disturbance; and (2) Kilgore's capacity to conform his conduct to the requirements of law was substantially impaired. In his conclusion, however, the trial judge wrote:
Concerning the mitigating circumstances, I have found that both statutory mental health circumstances were proved during the penalty phase. Nevertheless, there is little or nothing about the facts of this case from which one could conclude that at the time of the murder, or during the twenty-four hours preceding the murder, Mr. Kilgore was under the influence of extreme mental or emotional disturbance.
Kilgore asserts that such a conclusion necessarily contradicts the earlier finding that the two statutory mitigating factors existed. Basically, Kilgore is complaining that the judge gave no weight to the statutory mitigation. We disagree. Instead, we read the sentencing order to indicate that the mental health factors were entitled to little weight. Certainly this is within the discretion of the trial court. E.g., Jones v. State, 648 So.2d 669, 680 (Fla.1994) (the weight to be given mitigating factors is within the trial court's discretion); Swafford v. State, 533 So.2d 270, 278 (Fla.1988); Herring v. State, 446 So.2d 1049, 1057 (Fla.1984).
Kilgore also asserts that the trial court erred in failing to thoroughly explain its rulings on nonstatutory mitigation. We cannot agree. We find that the sentencing order, in these circumstances, satisfies the dictates of both Campbell v. State, 571 So.2d 415 (Fla. 1990), and Lucas v. State, 568 So.2d 18 (Fla.1990). The trial court expressly evaluated both mitigation proposed by Kilgore and mitigation found in the record. While we acknowledge that the trial court failed to expressly comment on the relationship between Kilgore and Jackson, we find the error, if any, to be harmless. The existence of this relationship was presented during the trial. *506 We are confident that the trial judge was cognizant of this factor when weighing the mental health evidence.
Kilgore, 688 So.2d at 900-01.
Even if we rejected the postconviction court's finding that the evidence introduced during the postconviction evidentiary hearing is cumulative, Kilgore would still need to overcome the postconviction court's finding that Kilgore failed to establish actual prejudice as required by Strickland. In the trial court's sentencing order, the trial court found two aggravating circumstances: (1) Kilgore was under sentence of imprisonment at the time he committed the murder;[10] and (2) Kilgore was previously convicted of a felony involving the use or threat of violence to the person.[11]See id. at 897. The trial court also found two statutory mitigating factors: (1) Kilgore acted under the influence of extreme mental or emotional disturbance;[12] and (2) Kilgore's capacity to conform his conduct to the requirements of the law was substantially impaired.[13]See id. The trial court also found three nonstatutory mitigators: (1) Kilgore's extreme poverty as a child; (2) his lack of education; and (3) his poor mental and physical condition. Although the trial court did not assign a particular weight to each factor, it did find that the aggravating circumstances "far outweighed" the statutory and non-statutory mitigating circumstances.
Because the trial court already found that both statutory mental mitigators had been established in addition to three nonstatutory mitigating circumstances, Kilgore has not satisfied his burden of establishing that any alleged failures on behalf of trial counsel have "so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined." Maxwell, 490 So.2d at 932. Accordingly, we deny relief on this issue.[14]

BRADY CLAIM[15]
Kilgore next claims that the "attorney notes" of the lawyers who prosecuted the 1978 case that were uncovered during postconviction proceedings called into question Barbara Ann Jackson's testimony during the 1978 trial. Kilgore claims that the State's failure to provide these notes to defense counsel constitutes a Brady violation and that relief is warranted on this claim. For the reasons discussed below, we deny relief.
Brady requires the State to disclose material information within its possession or control that is favorable to the defense. See Mordenti v. State, 894 So.2d 161, 168 (Fla.2004). To establish a Brady violation, the defendant has the burden to show (1) that favorable evidenceeither exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the *507 evidence was material, the defendant was prejudiced. See Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); see also Way v. State, 760 So.2d 903, 910 (Fla.2000). To meet the materiality prong, the defendant must demonstrate a reasonable probability that had the suppressed evidence been disclosed, the jury would have reached a different verdict. See Strickler, 527 U.S. at 289, 119 S.Ct. 1936. A reasonable probability is a probability sufficient to undermine confidence in the outcome. See Way, 760 So.2d at 913; see also Strickler, 527 U.S. at 290, 119 S.Ct. 1936. The remedy of retrial for the State's suppression of evidence favorable to the defense is available when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Strickler, 527 U.S. at 290, 119 S.Ct. 1936 (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). Giving deference to the postconviction court on questions of fact, this Court reviews de novo the application of the law and independently reviews the cumulative effect of the suppressed evidence. See Mordenti, 894 So.2d at 169; Way, 760 So.2d at 913.
In denying relief for this claim, the postconviction court found that the attorney notes in question were taken during depositions at which Kilgore's counsel was also present. The presence of Kilgore's counsel, therefore, undermines any suggestion that the content of the deposition was suppressed. The postconviction court accepted the State's argument that the deposition transcripts were more complete than the attorney notes, and therefore, no Brady violation occurred. Kilgore has failed to prove prejudice was generated by this alleged Brady violation, and because he has failed to establish any evidence, favorable or not, that was withheld, he fails under both the second and third prongs of Brady. Accordingly, we deny relief on this claim.

Mental Retardation
Under this claim, Kilgore challenges (1) the postconviction court's determination that Kilgore is not mentally retarded; and (2) this Court's decision in Cherry v. State, 781 So.2d 1040 (Fla.2000). For the reasons discussed below, we deny relief on this issue.
In Nixon v. State, 2 So.3d 137, 141 (Fla.2009), this Court summarized the history leading up to the current definition of mental retardation in Florida:
In 2001, the Florida Legislature enacted section 921.137, Florida Statutes (2001), which barred the imposition of a death sentence on the mentally retarded and established a method for determining which capital defendants are mentally retarded. See § 921.137, Fla. Stat. (2001). The following year, the United States Supreme Court issued its opinion in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), holding that execution of mentally retarded offenders constitutes "excessive" punishment under the Eighth Amendment. In response to Atkins and section 921.137, we promulgated Florida Rule of Criminal Procedure 3.203, which specifies the procedure for raising mental retardation as a bar to a death sentence. Pursuant to both section 921.137 and rule 3.203, a defendant must prove mental retardation by demonstrating: (1) significantly subaverage general intellectual functioning; (2) concurrent deficits in adaptive behavior; and (3) manifestation of the condition before age eighteen. See § 921.137(1), Fla. Stat. (2007); Fla. R.Crim. P. 3.203(b).
The Nixon Court also summarized the appropriate standard of review for mental retardation determinations:

*508 When reviewing mental retardation determinations, we must decide whether competent, substantial evidence supports the trial court's findings. See Cherry [v. State], 959 So.2d [702] at 712 [(2007)] (citing Johnston v. State, 960 So.2d 757 (Fla.2006)). We do not "reweigh the evidence or second-guess the circuit court's findings as to the credibility of witnesses." Brown v. State, 959 So.2d 146, 149 (Fla.2007) (citing Trotter v. State, 932 So.2d 1045, 1049 (Fla. 2006)). However, we review the trial court's legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004).
Id.
The final order of the postconviction court noted that Kilgore received three very similar IQ scores: 74, 75, and 76. The Court dismissed the remaining three IQ scores, 67, 84, and 85, as falling at "two extremes of the spectrum." With regard to Kilgore's IQ score of 67, the trial court made an explicit finding that the "single score does not sufficiently satisfy the intellectual functioning prong for mental retardation under either a preponderance of the evidence standard or a clear and convincing evidence standard." The trial court thus found that "under both a preponderance of the evidence standard as well as a clear and convincing evidence standard, that Defendant does not meet the Florida criteria for significantly subaverage general intellectual functioning as required for a finding of mental retardation."
A proper review of the postconviction court's determination that Kilgore is not mentally retarded must first begin with the postconviction court's determination that Cherry is applicable here. Kilgore claims that this Court's decision in Cherry violates the United States Supreme Court's decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). This Court, however, has already explicitly rejected this exact argument in Nixon:
Nixon first argues that this Court's interpretation of section 921.137 in Cherry, which requires a defendant to have an IQ score of 70 or below, violates Atkins. [n.4] Nixon asserts that because the Supreme Court noted in Atkins that the consensus in the scientific community recognizes an IQ between 70 and 75 or lower, states are only permitted to establish procedures to determine whether a capital defendant's IQ is 75 or below on a standardized intelligence test. Nixon's claim is without merit. [n.5] In Atkins, the Supreme Court recognized that various sources and research differ on who should be classified as mentally retarded. Accordingly, the Court left to the states the task of setting specific rules in their statutes. See Atkins, 536 U.S. at 317, 122 S.Ct. 2242 ("As was our approach in Ford v. Wainwright[, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)] with regard to insanity, `we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'") (citations omitted). This State in section 921.137(1) defines subaverage general intellectual functioning as "performance that is two or more standard deviations from the mean score on a standardized intelligence test specified in the rules of the Agency for Persons with Disabilities." We have consistently interpreted this definition to require a defendant seeking exemption from execution to establish he has an IQ of 70 or below. See, e.g., Jones v. State, 966 So.2d 319, 329 (Fla.2007) ("[U]nder the plain language of the statute, `significantly subaverage general intellectual functioning' correlates with an IQ of 70 or below."); *509 Zack v. State, 911 So.2d 1190, 1201 (Fla. 2005) (finding that to be exempt from execution under Atkins, a defendant must establish that he has an IQ of 70 or below).
[N.4] In Cherry, we noted that another jurisdiction considering a similar claim found that "fourteen of the twenty-six jurisdictions with mental retardation statutes have a cutoff of seventy or two standard deviations below the mean." 959 So.2d at 713 n. 8 (citing Bowling v. Commonwealth, 163 S.W.3d 361, 373-74 (Ky.) (upholding use of seventy IQ score cutoff), cert. denied, 546 U.S. 1017, 126 S.Ct. 652, 163 L.Ed.2d 528 (2005)).
[N.5] Nixon makes a number of assertions questioning this Court's Cherry decision. All of these arguments are versions of his main argument that an IQ of 70 or below should not be the standard and that such a standard is unconstitutional.
Nixon, 2 So.3d at 142.
There is competent, substantial evidence to support the postconviction court's finding that Kilgore does not meet the first prong for mental retardation as defined by section 921.137 and rule 3.203. Kilgore received the following full-scale IQ scores: 76 (Dr. KremperAugust 1989), 84 (Dr. CiotolaMarch 1990), 67 (Dr. DeeMarch 1994), 75 (Dr. EisensteinAugust 2000), 74 (Dr. DeeOctober 2004), 85 (Dr. GamacheMay 2006).
The evidence suggests that the full-scale scores of 84 and 85 may not be reliable. The full-scale score of 84 was achieved through a test administered six months after the first administration of the IQ test. Dr. Ciotola's own report acknowledged that the practice effect was likely an issue. Similarly, Dr. Gamache's May 2006 administration that resulted in a full-scale score of 85 was the sixth administration of the WAIS-III, and thus was probably affected by the practice effect. Casting even further doubt on Dr. Gamache's administration is the fact that it was prorated. Finally, the fact that Kilgore had just entered the "55 plus" category, which automatically increases the IQ score by five to six points simply because of one's age, further reduces the credibility of Dr. Gamache's score.
The evidence revealed that Dr. Dee's initial full-scale score of 67 is also unreliable. First, Dr. Dee's initial reported score was the product of a prorated administration of the WAIS. The unreliable nature of that score was exposed by Dr. Dee's second administration, which involved a full battery of tests, resulting in a full-scale score of 74. Further, Dr. Eisenstein acknowledged that there is a reasonable basis for discrediting the full-scale score of 67 found by Dr. Dee.
Accordingly, the three IQ scores of 74, 75, and 76 appear to be the scores most representative as to whether Kilgore possesses "subaverage general intellectual functioning." Competent, substantial evidence clearly supports the postconviction court's finding that Kilgore fails under the first prong required for mental retardation. We have consistently held that a defendant seeking exemption from execution must prove he has an IQ of 70 or below. See, e.g., Jones v. State, 966 So.2d 319, 329 (Fla.2007); Zack v. State, 911 So.2d 1190, 1201 (Fla.2005). There is ample evidence in the record to discredit the only qualifying score, Dr. Dee's full-scale score of 67. Accordingly, we deny relief on this issue.

Rule 3.203(d)(4)(c) (2004) Challenge
In his challenge to the constitutionality of rule 3.203, Kilgore asserts five claims: (1) rule 3.203 fails to extend Sixth Amendment rights to him as required by Atkins; *510 (2) rule 3.203 fails to provide notice with regard to what standard of proof will be applied to his claim; (3) if Kilgore must bear the burden of proof, the standard should be preponderance of the evidence; (4) due process is violated by failing to have a jury determine mental retardation and by placing the burden of proof on Kilgore; and (5) Cherry and the IQ cut-off score of 70 are obstacles to his mental retardation claim. For the reasons discussed below, we deny relief on each of these claims.
Kilgore first asserts that rule 3.203, which requires mental retardation challenges for defendants sentenced to death prior to the United States Supreme Court's decision in Atkins to be raised in a motion pursuant to rule 3.850 or 3.851, denies him a number of rights guaranteed to him by the Sixth Amendment. Kilgore claims that rule 3.203 extends Sixth Amendment guarantees to those who were not yet sentenced to death at the time Atkins was decided, yet fails to do so for individuals similarly situated to Kilgore.
This claim is completely without merit. Kilgore provides absolutely no authority to support his contention that the Sixth Amendment extends to any defendant who files a motion seeking relief pursuant to rule 3.203. To the contrary, both Florida courts and the United States Supreme Court have repeatedly held that the right to counsel does not extend to postconviction proceedings. See Coleman v. Thompson, 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); Padgett v. State, 743 So.2d 70, 72 (Fla. 4th DCA 1999). Kilgore fails to advance a single Sixth Amendment right that was violated in the proceedings below. To the contrary, the record reflects that Kilgore actually received all the Sixth Amendment protections. Accordingly, we deny relief on this claim.
Kilgore next alleges that the omission of a standard of proof from rule 3.203 gives Kilgore no notice with regard to what standard will be applied to his claim, in violation of due process. However, Kilgore does not provide any authority to support his contention that due process requires a particular notice, and the applicable statute contains a statement as to the evidence necessary. Accordingly, this claim is without merit.
Kilgore also alleges that if defendants have the burden of proving that they are not mentally retarded, they should only need to do so by a preponderance of the evidence. This Court need not address this claim because the postconviction court held that Kilgore could not establish his mental retardation under either the clear and convincing standard or the preponderance of the evidence standard. See Nixon, 2 So.3d at 145 ("We need not address this claim because the circuit court held that Nixon could not establish his mental retardation under either the clear and convincing evidence standard or the preponderance of the evidence standard.") (citing Jones v. State, 966 So.2d 319, 329-30 (Fla. 2007)). Further, competent, substantial evidence exists to support the finding of the trial court that Kilgore is not mentally retarded.
Finally, Kilgore alleges that due process is violated because rule 3.203 does not require a jury to determine whether a defendant is mentally retarded. Again, this claim was addressed and denied in Nixon:
Nixon also claims that under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), due process requires that a jury find beyond a reasonable doubt any facts that would make a defendant eligible for the death penalty. We have rejected this argument and held that a defendant "has no right under *511 Ring and Atkins to a jury determination of whether he is mentally retarded." Arbelaez v. State, 898 So.2d 25, 43 (Fla.2005); see also Rodriguez v. State, 919 So.2d 1252, 1267 (Fla.2005); Bottoson v. Moore, 833 So.2d 693 (Fla.2002).
2 So.3d at 145.

Improper Prosecutorial Comments
Kilgore alleges that he was denied a fair trial because of improper prosecutorial comments made at trial and trial counsel's failure to object to those comments. In his initial brief to this Court for this claim, Kilgore simply asserts conclusory statements that reiterate arguments made before the postconviction court. Accordingly, these issues are waived for appellate review. See Rose v. State, 985 So.2d 500, 509 (Fla.2008) ("Rose has merely stated a conclusion and referred to arguments made below. Thus, we consider the issue waived for appellate review."); see also Coolen v. State, 696 So.2d 738, 742 n. 2 (Fla.1997) (stating that a failure to fully brief and argue points on appeal "constitutes a waiver of these claims"); Duest v. Dugger, 555 So.2d 849, 852 (Fla.1990) ("The purpose of an appellate brief is to present arguments in support of the points on appeal. Merely making reference to arguments below without further elucidation does not suffice to preserve issues, and these claims are deemed to have been waived.").
Even if these claims had been properly pled, they are meritless. Kilgore merely states that the "prosecutor's arguments at the guilt/innocence and penalty phases presented impermissible considerations to the jury, misstated the law and facts, and were inflammatory and improper." In his initial brief to this Court, Kilgore fails to allege any specific prosecutorial comment or action that was allegedly improper. The postconviction court summarily denied multiple claims that trial counsel failed to object to improper prosecutorial comments in its May 2004 order, finding that none of the comments asserted by Kilgore were improper, and therefore Kilgore failed to establish that counsel was deficient. The postconviction court also granted an evidentiary hearing on an alleged "Golden Rule" violation by the prosecutor, but after hearing testimony at the 2005 evidentiary hearing, the court found that Kilgore failed to establish that counsel performed deficiently or that he was prejudiced by the statement. The postconviction court examined each claim and provided an in-depth analysis into why the comments were not improper. Kilgore has failed to overcome the "strong presumption that trial counsel's performance was not ineffective." Strickland, 466 U.S. at 690, 104 S.Ct. 2052. Accordingly, although we find that this claim is procedurally barred, we also find that it is without merit.

Prohibition Against Jury Interviews
Kilgore next alleges that his constitutional rights were violated by the rule that prohibits defense counsel from interviewing jurors to determine if constitutional error was present. This claim is procedurally barred. See Allen v. State, 854 So.2d 1255 (Fla.2003) (finding a challenge to the constitutionality of the rules governing juror interviews procedurally barred in postconviction proceedings). It is also without merit because this Court has repeatedly rejected claims that Rule Regulating the Florida Bar 4-3.5(d)(4) is unconstitutional. See Floyd v. State, 18 So.3d 432, 459 (Fla.2009). Accordingly, we deny relief on this claim.

Method of Execution Challenge
Finally, Kilgore claims that electrocution and/or lethal injection violate the Eighth and Fourteenth Amendments to the United States Constitution and international *512 law. This claim is also procedurally barred. See Suggs v. State, 923 So.2d 419, 441 (Fla.2005) ("Suggs claims that execution by electrocution or lethal injection constitutes cruel and unusual punishment. Because this claim was not raised on direct appeal, it is procedurally barred.") It is also without merit. See, e.g., Tompkins v. State, 994 So.2d 1072, 1080-82 (Fla.2008) (upholding the constitutionality of Florida's capital-sentencing scheme and lethal-injection protocol). Accordingly, we deny relief for this claim.

HABEAS PETITIONINEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL
Claims of ineffective assistance of appellate counsel are appropriately presented in a petition for writ of habeas corpus. See Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). Consistent with the Strickland standard, to grant habeas relief based on ineffectiveness of appellate counsel, this Court must determine
first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986); see also Freeman, 761 So.2d at 1069; Thompson v. State, 759 So.2d 650, 660 (Fla.2000). In raising such a claim, "[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." Freeman, 761 So.2d at 1069; see also Knight v. State, 394 So.2d 997, 1001 (Fla.1981). Claims of ineffective assistance of appellate counsel may not be used to camouflage issues that should have been presented on direct appeal or in a postconviction motion. See Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000). "If a legal issue `would in all probability have been found to be without merit' had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective." Id. (quoting Williamson v. Dugger, 651 So.2d 84, 86 (Fla. 1994)).
Kilgore makes seven allegations that appellate counsel was ineffective due to his failure to adequately investigate and prepare. We conclude that Kilgore has failed to meet his burden on any of these claims.
First, Kilgore alleges that appellate counsel was ineffective in failing to challenge the evidentiary ruling of the trial court with regard to Emerson Robert Jackson's purported HIV status. If a trial court has weighed the evidence to determine whether its value was more probative than prejudicial, this Court will not overturn a trial court decision absent an abuse of discretion. See Murray v. State, 3 So.3d 1108, 1124 (Fla.), cert. denied, ___ U.S. ___, 130 S.Ct. 396, 175 L.Ed.2d 273 (2009). Here, there does not appear to be any indication that the trial court abused its discretion when it refused to admit evidence of the victim's alleged HIV status. In his petition for a writ of habeas corpus, Kilgore fails to even allege how he was prejudiced by the trial court's refusal to permit evidence of whether Emerson Robert Jackson was diagnosed with HIV. Kilgore has thus failed to meet his burden of meeting both prongs of Strickland. See Freeman, 761 So.2d at 1062 (citing Strickland, 466 U.S. at 687, 104 S.Ct. 2052). Accordingly, we deny relief on this claim.
Second, Kilgore alleges that appellate counsel was ineffective in failing *513 to challenge the trial court's (a) denial of a motion to allow the jury to view the crime scene on the basis that photos of the scene were sufficient, and (b) admitting over objection a floor-plan diagram to be placed in evidence without a proper predicate. A motion for jury view is a determination that is left to the discretion of the trial court and there is a presumption of correctness as to its rulings absent a demonstration to the contrary. See Thomas v. State, 748 So.2d 970, 983 (Fla.1999) (citing Bundy v. State, 471 So.2d 9, 20 (Fla.1985)). Here, there does not appear to be any indication that the trial court abused its discretion. Further, in his petition for a writ of habeas corpus, Kilgore has failed to provide any explanation with regard to why a jury walkthrough was essential or why the photographs in evidence were insufficient. Kilgore has thus failed under both prongs of Strickland. See Freeman, 761 So.2d at 1062 (citing Strickland, 466 U.S. at 687, 104 S.Ct. 2052). Accordingly, we deny relief on this claim.
Third, Kilgore alleges that appellate counsel was ineffective in failing to challenge the trial court's failure to include a jury instruction for third-degree murder as a lesser included offense. Even if the trial court was in error for failing to include a jury instruction for third-degree murder, such an error would be harmless because it is two steps removed from the offense of which Kilgore was convicted. In State v. Abreau, 363 So.2d 1063, 1064 (Fla.1978), we held that
if a defendant is charged with offense "A" of which "B" is the next immediate lesser-included offense (one step removed) and "C" is the next below "B" (two steps removed), then when the jury is instructed on "B" yet still convicts the accused of "A" it is logical to assume that the panel would not have found him guilty only of "C" (that is, would have passed over "B"), so that the failure to instruct on "C" is harmless.
Here, the jury was instructed on first-degree murder, second-degree murder, and manslaughter. He was convicted of first-degree murder. Accordingly, any alleged error stemming from the trial court's failure to instruct on third-degree murder is harmless under Abreau. We therefore deny relief on this claim.
Fourth, Kilgore alleges that appellate counsel was ineffective in failing to challenge the trial court's denial of Kilgore's motion for mistrial after he created a disturbance in the courtroom and overturned a table when audiotapes were played concerning the testimony of two correctional officers that Kilgore attempted to burn the victim after pouring flammable liquid on him. This claim is without merit. This Court applies an abuse of discretion standard to a denial of a motion for a mistrial. See Evans v. State, 995 So.2d 933, 953 (Fla.2008) (citing England v. State, 940 So.2d 389, 402 (Fla.2006)). In his petition for a writ of habeas corpus, Kilgore has failed to allege how the trial court abused its discretion in failing to grant the motion. To the contrary, the trial court's decision is understandable given that the motion for mistrial was based on Kilgore's own disruptive conduct. Kilgore has thus failed to meet his burden of meeting both prongs of Strickland. See Freeman, 761 So.2d at 1062 (citing Strickland, 466 U.S. at 687, 104 S.Ct. 2052). Accordingly, we deny relief on this claim.
Fifth, Kilgore alleges that appellate counsel was ineffective in failing to challenge the trial court's denial of a motion for directed verdict in which he asserted that the count which charged premeditated murder should have actually *514 charged second-degree murder.[16] A ruling on a motion for judgment of acquittal is reviewed de novo. See Pagan v. State, 830 So.2d 792, 803 (Fla.2002). Generally, an appellate court will not reverse a conviction which is supported by competent, substantial evidence. See id. Through our affirmation of Kilgore's conviction of first-degree murder, this Court has already held that competent, substantial evidence exists to support that charge. See Kilgore v. State, 688 So.2d 895, 901 (Fla.1996). The motion for directed verdict was without merit and counsel cannot be considered ineffective for failing to challenge it on direct appeal. See Rutherford, 774 So.2d at 643. Kilgore has thus failed to meet his burden of meeting both prongs of Strickland. See Freeman, 761 So.2d at 1062 (citing Strickland, 466 U.S. at 687, 104 S.Ct. 2052). Accordingly, we deny relief on this claim.
Sixth, Kilgore alleges that appellate counsel was ineffective in failing to challenge the trial court ruling which permitted Barbara Ann Jackson to testify during the penalty phase when trial counsel had been unable to depose her. However, a review of the record fails to reveal a proper objection by defense counsel to Barbara Ann Jackson testifying during the penalty phase. Accordingly, because the issue was not properly preserved at trial by objection, appellate counsel cannot be ineffective for failing to raise this claim on appeal unless the claim constituted fundamental error. See Valle v. Moore, 837 So.2d 905, 909 (Fla.2002). Kilgore has failed to allege fundamental error, and none exists here. Further, even if the claim was preserved, Kilgore's failure to allege actual prejudice results in his ultimate failure to meet his burden of meeting both prongs of Strickland. See Freeman, 761 So.2d at 1062 (citing Strickland, 466 U.S. at 687, 104 S.Ct. 2052). Accordingly, we deny relief on this claim.
Kilgore's final allegation is that appellate counsel was ineffective in failing to challenge the trial court's decision to allow a correctional officer to testify with regard to Kilgore's state of mind after the murder in that when Kilgore discovered that the victim was dead, Kilgore began crying, wailing, flailing his arms and became so upset when he saw the deceased victim on a gurney that he had to be restrained. Through his petition for writ of habeas corpus Kilgore alleges that "trial counsel preserved this issue in his motion for new trial but appellate counsel failed to carry it forward." However, the record citation provided by Kilgore actually refers to defense counsel's cross-examination of the correctional officer. Kilgore fails to allege with any specificity the prejudice sustained due to the officer's testimony. Kilgore's failure to allege actual prejudice results in his ultimate failure to meet his burden of meeting both prongs of Strickland. See Freeman, 761 So.2d at 1062 (citing Strickland, 466 U.S. at 687, 104 S.Ct. 2052). Accordingly, we deny relief on this claim.

CONCLUSION
For the foregoing reasons, we affirm the denial of the rule 3.850 motion by the postconviction court and deny relief on the petition for writ of habeas corpus.
It is so ordered.
*515 CANADY, C.J., and LEWIS, POLSTON, LABARGA, and PERRY, JJ., concur.
PARIENTE, J., concurs in result with an opinion.
QUINCE, J., recused.
PARIENTE, J., concurring in result.
I do not fully concur in the majority opinion because in my view trial counsel was deficient for failing to adequately investigate Kilgore's childhood and mental health history during the 1994 penalty phase. Thus, I do not agree that Bobby v. Van Hook, ___ U.S. ___, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009), is applicable to the deficiency prong of this claim.
As we have explained, "[A]n attorney has a strict duty to conduct a reasonable investigation of a defendant's background for possible mitigating evidence." Ragsdale v. State, 798 So.2d 713, 716 (Fla.2001) (quoting State v. Riechmann, 777 So.2d 342, 350 (Fla.2000)). In this case, trial counsel failed to conduct a reasonable investigation by failing to discover additional sources of mitigating evidence available concerning Kilgore's childhood and mental health history, including evidence with regard to the time Kilgore was institutionalized at the Oakley Training School, where he experienced frequent beatings.
Nonetheless, I concur in the result reached by the majority because I agree that Kilgore failed to establish actual prejudice as to this claim.
NOTES
[1] Although the victim in the case currently under review, Emerson Robert Jackson, possesses the same family name as the victim in the 1978 offense, the two are not related.
[2] See § 921.141(5)(a), Fla. Stat. (1995).
[3] See § 921.141(5)(b), Fla. Stat. (1995).
[4] See § 921.141(6)(b), Fla. Stat. (1995).
[5] See § 921.141(6)(f), Fla. Stat. (1995).
[6] Kilgore advanced the following claims: (1) he was denied due process when his request for a special heat-of-passion jury instruction was denied; (2) he was denied due process when the trial court denied defense counsel's request to reevaluate Kilgore's competency; (3) he was denied due process when he was allowed to waive his presence at jury selection; (4) his rights under the Eighth Amendment were violated when the trial court denied an individualized determination that a death sentence was appropriate; (5) his rights under the Eighth and Fourteenth Amendments were violated due to the sentencing order's insufficient treatment of the mitigation presented; and (6) his rights under the Eighth and Fourteenth Amendments were violated when the trial court denied his request for a jury instruction on nonstatutory mitigating factors.
[7] The claims were as follows: claim Ivarious government agencies have not complied with Kilgore's public records requests; claim IIineffective assistance of counsel (thirty-three sub-claims); claim IIIthe State withheld material and exculpatory evidence; claim IVineffective assistance of counsel voir dire (three sub-claims); claim Vineffective assistance of counselfailure to object to improper prosecutorial comments (sixteen sub-claims); claim VIdefense counsel failed to obtain adequate mental health experts/mental retardation (nine sub-claims); claim VIIKilgore is entitled to postconviction relief based on cumulative error; claim VIIIineffective assistance of counselfailure to investigate and prepare mental health mitigation; claim IXdefendant is innocent of first-degree murder; claim Xdefendant is innocent of the death penalty (three sub-claims); claim XIthe penalty phase instructions impermissibly shifted the burden to the defendant to prove that death was inappropriate (eight sub-claims); claim XIIthe jury instructions listing the aggravating circumstances were facially vague and overbroad; claim XIIIKilgore's jury was improperly told that their verdict was merely advisory, in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (three sub-claims); claim XIVthe rules prohibiting juror interviews are unconstitutional (two sub-claims); claim XVineffective assistance of counselfailure to object to the State's closing argument regarding aggravators and mitigators (four sub-claims); claim XVIexecution by electrocution or lethal injection constitutes cruel and unusual punishment to the extent that it violates constitutional and international law (three sub-claims); claim XVIIFlorida's capital sentencing statute is unconstitutional on its face (seven sub-claims); claim XVIIIthe jury was misinformed about the standard for finding mitigating evidence; claim XIXineffective assistance of counselfailure to request a change of venue; claim XXineffective assistance of counselfailure to argue that alleged racial considerations influenced the State's decision to seek the death penalty (three sub-claims); claim XXIadequate weight was not given to the mitigating circumstances (two sub-claims); claim XXIIthe sentencing order failed to independently weigh aggravation versus mitigation; claim XXIIIomissions in the appellate record exist; claim XXIVthe use of defendant's prior violent felonies as grounds for the aggravating factor violated Johnson v. Mississippi, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988); claim XXVthe trial court was biased in favor of the State; claim XXVIthe defendant is too insane to be executed; and claim XXVIIthe defendant is entitled to relief based on cumulative error.
[8] Huff v. State, 622 So.2d 982 (Fla.1993).
[9] The trial court initially denied all of claim XX in its May 4, 2004, order, but later amended its order to grant an evidentiary hearing for part of claim XX.
[10] See § 921.141(5)(a), Fla. Stat. (1995).
[11] See § 921.141(5)(b), Fla. Stat. (1995).
[12] See § 921.141(6)(b), Fla. Stat. (1995).
[13] See § 921.141(6)(f), Fla. Stat. (1995).
[14] Kilgore asserts that he was also denied his rights under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). However, the State is correct that Kilgore's claim that he was deprived of his right to an evaluation by a competent mental health expert is procedurally barred because it could have been raised on direct appeal. See Marshall v. State, 854 So.2d 1235, 1248 (Fla.2003) (citing Cherry v. State, 781 So.2d 1040, 1047 (Fla. 2000)) ("[T]he claim of incompetent mental health evaluation is procedurally barred for failure to raise it on direct appeal.").
[15] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[16] Although the petition for a writ of habeas corpus references a motion for directed verdict, the proper motion is actually a motion for judgment of acquittal. See Fla. R.Crim. P. 3.380.